(Decided March 22nd, 1859.)

---

# MARY GREER *vs*. GEORGE BAUGHMAN and others, and MARY JANE BAUGHMAN and others *vs*. MARY GREER and others.

A resulting trust may be established by parol proof, but the proof must be *clear* and *convincing* that the purchase money was paid by the *cestui que trust*, for otherwise titles depending on deeds and other written instruments would be rendered insecure.

The testimony of a witness, in whose name the paper-title stood, (and who, by the direction of his mother-in-law, had conveyed the property in trust for his wife and children,) to show a resulting trust in his mother-in-law, should be received with caution as coming from a witness operated on by a strong bias.

The evidence of such a witness, showing that his mother-in-law had the means to and did make the purchase, unsupported by other material testimony, and contradicted by other proof of her circumstances and condition in life creating a serious doubt whether she possessed the means to make the requisite payments, is insufficient to establish a resulting trust in her.

The property in controversy having been attached by his creditors as the property of the party in whose name the paper-title stood, and judgments of condemnation recovered, and the property, by an agreement, having been sold, and the proceeds brought into court, such creditors having judgments on attachments based upon claims existing prior to the date or previous to the recording of an assignment made by the debtor in favor of his wife and children, are entitled to the fund.

A motion to transfer a case from the equity side of the Superior court of Baltimore city to the Circuit court for said city, made *after* the judge of the Superior court had pronounced his opinion dismissing the bill, comes *too late*, and was properly refused.

APPEALS from the Equity Side of the Superior Court of Baltimore city.

The original bill in this case was filed by Mary Greer, on

33      v. 13.

the 30th of December 1852, and claims as her property a lot of ground in the city of Baltimore, improved with a brick dwelling house, which she alleges was, at her request, contracted by George Baughman, as her agent, to be leased to her by James Howard McHenry, for a term, renewable forever, and which with her moneys was improved with the dwelling house; but through some inadvertence of the lessor's agent and of Baughman, the lease, dated the 4th of June 1843, was executed by McHenry to Baughman, instead of the complainant, as lessee; that this was done without her knowledge at the time, and did not become known to her till long afterwards, when the proper correction was promised by Baughman and said agent, or that Baughman would assign the said leasehold property to her or as she might direct, and that Baughman, believing such to be the direction or the wish, or the eventual purpose of the complainant, did convey the said premises to Wm. J. Ward, in trust, for the separate use of his wife Mary Jane Baughman, the complainant's daughter, and in case of her death, for the use of her children by the said Baughman, by a conveyance, dated the 31st of December 1845, which was recorded some years thereafter, and immediately following, and at the same time with the original lease. The bill also states, that Baughman becoming indebted and removing from Baltimore, certain of his creditors attached this property and recovered judgments of condemnation against it to satisfy his debts. The bill also states, that the complainant wishes the property to be sold under a decree of the court, and avers that a sale will be beneficial for her daughter and children, should they prove entitled to the property under the deed of trust, and that a sale is necessarily the object of the creditors who have attached, for any benefit they may ultimately claim from the property, and that under the various and numerous, and conflicting interests involving the property, no sale can be had by any arrangement or understanding. The bill then prays a sale and an investment of the proceeds, to abide the controversy in the case, and finally prays that such proceeds of sale may be decreed to the complainant, or as she may appoint and direct.

To this bill the attaching creditors, Baughman and wife and their infant children, and Wm. J. Ward, the trustee in the deed of trust of the 31st of December 1845, were made defendants.

The creditors, in their answer, denying all the other allegations in the bill, and the jurisdiction of the court over the case, admit that they are creditors of Baughman, and have levied attachments upon the property in controversy, and recovered judgments of condemnation against the same, which judgments they insist are final and conclusive as to the right of property in the premises, and as to all matters in controversy in the attachment suits. They also admit, it would be for the advantage of all parties concerned, that the property should be sold, and the proceeds invested, pending the controversy, under the direction of the proper tribunal.

Baughman and wife in their answer fully admit all the allegations of the bill. Their infant children answered by guardian; and Ward in his answer says, he believes the lease was, as stated in the bill, made by mistake to Baughman instead of the complainant, and that the lot so leased was, in fact, improved with the proper means of the complainant as stated in her bill, and that Baughman was never the owner of the property, but that it was, in truth, the estate of the complainant, and as such, ought now to be disposed of as prayed by her bill, and for her use and benefit.

An agreement was then made by all the parties interested, that a decree for a sale of the property should be passed by the court, which was accordingly done, and the sale was made and ratified, and the proceeds brought into court and directed to be invested.

Testimony was then taken on both sides, which is fully stated in the opinion of this court. The short copies of the judgments with the docket entries and pleas in the attachment cases, which by agreement were to be used in this court as full records, show that Wm. J. Ward, interposed in those attachment suits, and filed a plea claiming the property under the deed of trust to him above referred to.

After the testimony had been closed, Mary Jane Baughman

and her infant children, filed a cross-bill in the cause, praying that the proceeds of sale may be adjudged to them, conformably to the aforesaid trust conveyance in their favor. To this cross-bill, Mrs. Greer, the original complainant, Baughman, the attaching creditors, and Ward, were made defendants. On this bill subpœnas were issued and returned summoned, but no other proceedings appear to have been taken thereon.

The court (LEE, J.) then passed the following decree in the cause: "This cause having been argued, and the bill, answers, evidence and other proceedings, having been read and fully considered, it is thereupon, this 9th day of February 1856, adjudged, ordered and decreed, by the Superior court for Baltimore city, and the authority thereof, that the bill heretofore filed in this cause, be, and the same is hereby dismissed with costs."

The original complainant, Mrs. Greer, filed a petition, praying the court to transfer and remove this case, and all the papers and proceedings therein, to the Circuit court for Baltimore city, according to the act of Assembly in such case made and provided. This petition the court dismissed and refused to direct the removal therein prayed, and by an agreement in the cause, it appears that this motion to transfer was made after the judge of the Superior court had pronounced his opinion dismissing the bill.

Mrs. Greer, the complainant in the original bill, and the complainants in the cross-bill, then appealed from the decree dismissing the original bill, and from the order of the court upon the petition of Mrs. Greer, praying the removal and transfer to the Circuit court for Baltimore city.

The cause was argued before LE GRAND, C. J., ECCLESTON and TUCK, J.

*Oliver Miller* and *Charles F. Mayer,* for the appellants:

The testimony in the cases, we think, clearly establishes in Mrs. Greer, the ownership of the property in question, by way of a *resulting trust,* against the deed made by Baughman to Ward. The evidence of Baughman, Wood, and Shipley,

Greer *vs.* Baughman, *et al.*

and the contract between Mrs. Greer and Shipley for the building of the house, *proves:* 1st. That the lease was originally intended for Mrs. Greer, and by *mistake* was made to Baughman; that she authorised Baughman, as her agent, to contract with Wood, the agent of the lessor, McHenry, for the lease to her. 2nd. That the property was improved by *her means.* The only value of leasehold property of this kind, consists in the improvements put upon it, and the increasing price of city lots. Can there be a doubt, upon this testimony, that she made the improvements in question? The contract for building the house was made in *her name,* she superintended and controled its erection, from the time it was commenced until it was completed, and lived in and occupied it as her own from that time forward. She paid for it with her means, principally with city stock purchased for her by Baughman, with her moneys invested, first in rail road scrip, and then converted into such stock. Baughman fully explains how this was done, and that the stock was placed in his name only for convenience, and as agent of Mrs. Greer his mother-in-law. 3rd. That Mrs. Greer had the means wherewith to make such improvements. Baughman fully explains how this was accomplished, and upon cross-examination states how she received money. The only evidence on the other side, consists of loose declarations, and vague conjectures and inferences as to her poverty, made by witnesses who confess they had no actual knowledge of her means.

As to the law in such a case, it is well settled, that a resulting trust, or a trust by operation of law, can both be *constituted* and *proved* by parol, because *such trusts* are *expressly exempted* from the operation of the statute of frauds, and it makes no difference that the property in which such a trust arises is *leasehold.* 2 *Story's Eq.,* secs. 1201, 1201 *(a.)* 2 *Spence's Eq.,* 219. 8 *Gill,* 357, *Hays. vs Hollis.* The creditors of Baughman, were in no way prejudiced, misled or defrauded by the mistake as to the lease being taken in his name, because the proof shows that it was *not recorded* until, and at the same time with, the assignment or deed of trust, *after* they became such creditors. They were, therefore, not

Greer *vs.* Baughman, *et al.*

misled by the record title, for so far as the record disclosed any information, it showed that the property did not belong to him, and they could not have trusted him upon the faith of his apparent ownership of, or of the record title to, the property.

If we are right in the position, that there was a resulting trust in Mrs. Greer, we then say that this trust estate could not be conveyed by *parol* in the form of a request, and especially not in the case of a voluntary conveyance. The statute of frauds requires the trust to be *manifested* or *proved* by writing, signed by the party who is *by law enabled to declare* the trust, otherwise it is *void*, and the 9th section of the statute also requires the assignment of any trust to be in writing. 7 *G. & J.*, 163, *Maccubbin vs. Cromwell. Willis on Trustees* in 10 *Law Lib.*, 20, 21. Now Mrs. Greer being the owner of this property, by way of resulting trust, she is the only party by *law enabled* to declare a trust therein in favor of her daughter and her children, and if she undertakes to do this, she must conform to the requirements of the statute of frauds, and do it in *writing*, for any attempt to do it by parol would be an evasion of the statute, and a trust so created or *declared* would be *void*. Baughman had no power to execute the deed of trust to Ward, for he was not the party by *law enabled to declare such* a trust, being in fact the mere holder of the title for the benefit of Mrs. Greer.

If Mrs. Greer then was entitled to the property, by way of resulting trust, and has not validly parted with that title by the *parol declaration* of the trust in favor of her daughter, Mrs. Baughman, and her children, the next question is, whether the attachment proceedings of the creditors, have in any way deprived her of it, or concluded her rights? Upon this point there is no room for doubt, for Mrs. Greer was *no party* to those proceedings, never *interposed* any claim to the property in those suits, and, by the very authorities, cited on the other side, of *Ranahan vs. O'Neale*, 6 *G. & J.*, 298, and *Trieber vs. Blocher*, 10 *Md. Rep.*, 14, is in no manner bound by such proceedings. See, also, *Drake on Attachments*, 221 to 223. If, therefore, this court should sustain Mrs. Greer's title by

way of a resulting trust, and that she had not parted with it, the case is free from all difficulty.

But if the court should be of opinion, that there was a valid declaration of the trust by Mrs. Greer, in favor of Mrs. Baughman and her children, and that the deed of trust to Ward is valid, then it is insisted, on the part of the complainants in the cross-bill, that under this deed *they* are entitled to these proceeds. It is conceded on the other side, that the assertion of their claim by way of a cross-bill is proper, and that the decree dismissing the original bill strikes down the cross-bill, and authorises an appeal on the part of these complainants therefrom. The question then is, have these complainants any rights under the deed of trust in their favor? And this depends upon the further question, whether the fact, that Ward, as trustee under this deed, interposed a claim of property in the attachments suits, and that the verdict and *judgment* was in favor of the creditors on that suit and on that plea or claim, concludes the rights of the *cestuis que trusts* under the deed?

It is submitted, that the inquiry into their title in the attachment proceedings, cannot have the effect of debarring their claims, because a judgment of condemnation in attachment, only gives the right to an *execution*, and all that an execution against *real property* can do, is, that it authorises a sale of *such interest only as the defendant debtor may have* therein; a judgment in attachment gives but right to *execution* and no *title* to the property. *Acts of* 1795, *ch.* 56, *sec.* 1, and 1715, *ch.* 40. 2 *H. & J.*, 101, *Owings vs. Norwood.* 3 *H. & McH.*, 597, 619.

Nor are the *cestuis que trust* bound by the act of the trustee in going in and filing this claim, of property. As a general rule, the *cestui que trust* will not be subject to any disadvantage which may arise from the trustee personally, on account of his being seized of the legal estate, nor will he be prejudiced by the trustee doing what the trust does not authorise, or injured by his not doing what it is his duty by the terms of the trust to perform. *Willis on Trustees*, in 10 *Law Lib.*, 57, 58. It was no part of the duty of this trustee under the deed of trust, to interpose this claim in the attachment pro-

ceedings. He was the mere holder of the naked legal title, and to hold, that this act on his part would forever debar the rights of these infant *cestuis que trust* to this property, would be in the highest degree inequitable; and it is, therefore, respectfully submitted, that these proceeds belong, and should be awarded to these complainants.

But finally, whatever may be the decision of this court upon the question of ownership of this property, the decree below is wrong and must be reversed. That decree *dismissed* the bill, and thus puts the whole case out of court, and yet the *funds* are *in court* under a decree passed by it for a sale of the property. Instead of dismissing the bill, the decree should have directed the fund to be paid over to the parties entitled to it.

*Malcolm, Nelson* and *Horwitz*, for the creditors:

The motion to transfer the case to the Circuit court for Baltimore city, was properly overruled, because it was made too late. If this motion can be sustained, the opinion of two inferior tribunals may be always had in each case, for all that is necessary to be done is to wait until the opinion of the court is pronounced, and then the party against whom the opinion may chance to be, is entitled to have the benefit of a new trial before another court. This is not the meaning or true construction of the act of Assembly. It never designed each case should be tried twice.

Was not the court equally right in dismissing the original and cross-bills? In the first place is it not clear, that Mrs. Greer has no interest in the property? Her bill is not a bill for the correction of the alleged mistake in the execution of the original lease, nor to reform that lease or the deed of trust. It simply alleges there was a mistake originally made, and when it came to her knowledge the proper correction was promised, or that Baughman would assign the property to her, *or as she might direct,* and that Baughman, believing such to be her wish, transferred the property to Ward, by the deed of trust. There is no pretence that this transfer was not by the direction, or in accordance with the wishes of the complain-

ant, and Baughman *proves* that it was *by her direction, at her instance and at her request*, that he executed it. If the evidence of Baughman proves there was a mistake in the original lease, the same evidence proves that Mrs. Greer has parted with her rights, and has no longer any interest in the property. But it is said, although this may be true, yet the deed of trust is of no avail because Mrs. Greer's trust estate could not be conveyed by parol in form of a request, and especially not in the case of a voluntary canveyance, and in support of this position the case of *Maccubbin vs. Cromwell,* 7 *G & J.,* 157 is referred to. That was a case in which the deed was absolute on its face, and the effort was to engraft on it a trust by proof *aliunde,* and the court held that the statute of frauds does not prove that trusts shall be *constituted* by writing, but that they shall be *proved* by some writing signed by the party who creates them, and then go on to decide that the admission in the answer of one of the defendants was sufficient proof in writing to establish the trust and engraft it on the deed. Here, however, we have the trust fully declared in the deed, signed by the party who creates it, and if any link were wanting to make the chain perfect, the *bill* filed in this case (as the *answer* in *Maccubbin vs. Cromwell*) setting out the deed of trust and alleging that it was made under the belief that it was by Mrs. Greer's direction, followed by the proof of Baughman, would supply it.

If it be true then, that the deed of trust to Ward is good, are not all the rights of his *cestuis que trust* disposed of by the attachment cases tried at law? The proceedings in these attachment cases show that Ward, as claimant of the property in question, pleaded this very deed, and that its validity, and the rights of the parties under it, were put in issue by that plea. It is insisted that the verdict on these issues is conclusive in regard to the rights of the claimant, and all claiming under him. 6 *G & J.,* 298, *Ranahan vs. O'Neal.* 10 *Md. Rep.,* 14, *Trieber vs. Blocher.*

Again, it is clear that the lease made to Baughman *was acquiesced in by Mrs. Greer,* that no effort had been made by her to correct it, and that she has directed that another title

34    v 13.

should be made under it. The deed of lease is, therefore, now *according to the intention of the parties.* There is no pretence of a mistake in the deed to Ward, and the original lease was assented to in its present form by Mrs. Greer, from the fact of her *directing* that deed to be made. It is now too late, therefore, to go behind it. Certainly so far as the complainants in the cross-bill are concerned, they have no claim except under the lease as it stands, and, so far as Mrs. Greer is concerned, there is no prayer for reforming the lease and destroying the subsequent trust. But the effort is to engraft not an equity by operation of law, but to set up a mistake acquiesced in, to get rid of a trust created, and to obtain the proceeds of the sale of property, not upon a bill filed to correct the error in the one case, or to show fraud in the other, but for a sale of the property to quiet conflicting claims. This is in direct violation of the decision of this court in *McElderry vs. Shipley,* 2 *Md. Rep.,* 35, 37, and on this point also, see the language of Judge Archer in delivering the opinion of the court in *Watkins vs. Stockett,* 6 *H. & J.,* 444.

But suppose that under this bill and proof Mrs. Greer has an interest in the decision of this case, and that her rights are still open to investigation, what evidence is there that she has any interest in the property, or ever expended one dollar in the improvements? Does not the proof show beyond all question that she was extremely poor and dependent for her very subsistence on Baughman's bounty during the very period that it is pretended she built the house in question? The testimony of Cobb, Dryden, Baugher, Jones and Mary D. Turner is referred to as fully sustaining this position. The property was, therefore, not only Baughman's because it stood in his name and the legal title was in him, but it was his because it was paid for with his money—built with his means. To permit the proceeds to be paid over to Mrs. Greer, would be to permit a palpable fraud' to be perpetrated on the creditors of Baughman. These creditors became such *before* the deed of trust was *recorded,* and some of them as early as July 1845, and this secret trust was devised and executed to defraud them of their just claims.

There is also another view of this case. Baughman was a *defendant* to the original bill, and was then *examined* by the complainant as a witness. Now, according to the rule of chancery practice, where a defendant is examined as a witness by the complainant the bill must be dismissed as to him, and, applying this rule to the present case, the bill must be dismissed as to Baughman, and being so dismissed the case entirely fails, because the complainant can only reach the creditors through Baughman. On this point see 1 *Bland*, 268 *Lingan vs. Henderson.* *Adam's Eq.*, 796.

ECCLESTON, J., delivered the opinion of this court.

In these appeals it is necessary to ascertain, whether, at any time, there existed a resulting trust in favor of Mary Greer, in the lot of ground described in the proceedings, and now in controversy.

A lease of the property for ninety-nine years, renewable forever, was executed on the twenty-fourth day of June, in the year eighteen hundred and forty-three, by James Howard McHenry to George Baughman. On the 31st of December 1845, he assigned the lease to William J. Ward, in trust for the sole and separate use of Mary Jane, the wife of G. Baughman, and in case of her death, for the use of the children of the said Mary Jane by the said George. The lease and the assignment were both recorded on the 19th day of September 1848.

Mary Greer alleges, in her bill, that the lot was contracted for, at her request, by G. Baughman, as her agent, the same to be leased to her by McHenry. That with her moneys the lot was improved by the erection of a dwelling house thereon. But through some inadvertence of the agent of said McHenry and of George Baughman, the lease of the lot was executed by McHenry to Baughman, as lessee, instead of her (the said Mary Greer) being made the lessee; all which was done without her knowledge at the time. And when it became known to her, a long time after, the proper correction was promised by Baughman and McHenry's agent, or that Baughman should assign the leasehold property to her, or as she might direct.

The original bill also states, "that George Baughman, believing such to be the direction, or the wish, or the eventual purpose of the complainant, as she is given to understand and believes was the said Baughman's impression, did, as she finds is the fact, convey said lot of ground, as improved as aforesaid, to William J. Ward, Esquire, of Baltimore, in trust for the separate use of Mary Jane Baughman, wife of the said George and daughter of the complainant, and for the children of said Mary Jane, by her marriage with the said George, 'in case of the death' of said Mary Jane."

Thus it will be seen, there is no record or written evidence of title to the lot in Mary Greer. She, therefore, can have no claim to the property. nor can her daughter or grandchildren have any, as derived from her, by virtue of the assignment in trust to William J. Ward, unless a resulting trust in Mrs. Greer is sustained by the proof.

In *Faringer vs. Ramsay, et al.*, 2 *Md. Rep.*, 375, there was an effort, by the trustee of an insolvent petitioner, to establish a resulting trust in opposition to two deeds. And there the court make a quotation from *Dorsey vs. Clarke*, 4 *Har. & Johns.*, 557, where it is said: "The authorities are clear, that the payment of the money by the *cestui que trust* must be clearly proved, otherwise you render insecure titles depending on deeds and other written documents."

The cases on this subject are examined by Chancellor Kent, with his usual ability, in *Boyd vs. M'Lean*, 1 *Johns. Ch. Rep.*, 582. He there says: "The cases uniformly show, that the courts have been deeply impressed with the danger of this kind of proof, as tending to perjury and the insecurity of paper title; and they have required the payment by the *cestui que trust* to be clearly proved." Although he concedes, that the rule has been established by the weight of authority, which allows parol proof of a resulting trust, yet it is evident, that if the point had been *res integra* he would have been inclined to think, "that such evidence is too dangerous in its consequences." And he speaks of the case of *Gascoigne vs. Theving*, (should be *Thwing*,) 1 *Vern.*, 366, as being a salutary admonition in regard "to the caution with which such proof ought to be examined."

The decision in *Boyd vs. McLean* was in support of the resulting trust. But it was upon strong and convincing proof, such as the chancellor considered "decidedly in favor of the charges contained in the bill." Three witnesses declared they were present when the parties, being together, made or acknowledged the alleged agreement. In addition to this testimony as to the original transaction, the confessions of the defendant to the same facts were proved by a number of other witnesses. And there were corroborating circumstances of considerable moment. But notwithstanding all this weight of evidence before him, the learned chancellor considered it proper to examine the case with much care and minuteness.

In *Lench vs. Lench*, 10 *Ves.*, 517, where the material evidence came from the trustee, who had been made a competent witness by a release, Sir William Grant, as Master of the Rolls, says: "She swears to no fact or circumstance capable of being investigated or contradicted, but merely to a naked declaration, supposed to be made by the husband himself, admitting that the purchase was made with the trust money. That is, in all cases, most unsatisfactory evidence, on account of the facility with which it may be fabricated, and the impossibility of contradicting it. Besides, the slightest mistake or failure of recollection may totally alter the effect of the declaration." And again, on page 519, it is said: "If evidence of this sort could be proceeded upon, standing unsupported, and in some degree contradicted by the circumstances, it ought to stand wholly uncontradicted by other evidence."

Keeping in view these authorities, which show what clear and satisfactory parol proof is necessary to establish a resulting trust, let us examine the proof now relied upon.

We have seen that the lease to G. Baughman is the instrument, in opposition to which Mrs. Greer is endeavoring to show a resulting trust in her favor. In his answer as a defendant, and in his testimony as a witness, he acknowledges that the lot was contracted for by him, as agent for Mrs. Greer, and that the improvements thereon were made by her and paid for with her means. His creditors have laid attachments upon this property, insisting that Mrs. Greer never had any legal or

equitable title to it, but that Baughman was the real owner, that the improvements thereon were made with his means, and that his assignment of the same was fraudulent as against his creditors. In order, therefore, to secure the property to his wife and children, he was deeply interested in showing that he never had any real title or claim thereto, but that Mrs. Greer was the true owner; at least until the assignment, which he says was made by her direction and at her request. Under such circumstances his statements should be considered with much caution, because they come from a witness operated upon by the influence of a strong bias.

He says, that about nine months after the contract had been made, the lease was executed to him by mistake, and when it was presented to him by the agent of the lessor, and the mistake was discovered, either the agent or he remarked it would make no difference, as he could convey it to Mrs. Greer. He does not recollect at what time he first mentioned to his mother-in-law that the lease had been executed to him. She had always said that the lot and improvements were intended by her for his wife. And the assignment from him was made at the instance and request of Mrs. Greer. After the execution of the lease he placed it, he says, in his safe among his private papers, intending to have it recorded the first time he should have occasion to go to the court house, but forgot it until urged by Mrs. Greer to make the conveyance, and after that was done it was placed in the hands of Mr. Ward, the trustee, who he supposed overlooked it as he had done before, and neither the lease nor the assignment was recorded until the 19th of September 1848.

Speaking of the improvements, Baughman says, he does not remember, certainly, what they cost, but believes the same to be about $1700, and was paid by the means of Mrs. Greer. Her means, at the time of payment, consisted chiefly of Baltimore city 6 per cent. stock. She had some cash to which she added by the sale of valuable jewelry and other personal property, the proceeds of which were put into his hands, which he used in the purchase of "rail road notes," (as they were called,) and invested them in city 6 per cent.

Greer *vs.* Baughman, *et al.*

stock, which, for convenience sake, (as he was to act as her agent,) was always done in his own name he believes. He bought the rail road notes at or about 60 cents, and sold the stock, either in whole or in part, to Sloan, White & Co., at 107 cents, taking lumber in payment, which Mr. Shipley, the builder of the improvements, received as so much cash.

In his testimony, Baughman says, there was a contract between Mrs. Greer and L. G. Shipley, by which the latter was to make the improvements according to a plan agreed upon; that the management of the details of the business connected with the leasing of the lot and making the improvements were attended to by Baughman, under the direction of Mrs. Greer. That some money was paid to Shipley, whether she paid the same herself or through the witness, he does not remember, but the chief payment was made as stated above.

Upon cross-examination this witness says, that at sundry times, before and after his marriage, Mrs. Greer, *he believes*, did receive moneys "as heir-at-law of the estate of Caleb Hall."

L. G. Shipley, a witness for the complainant, states, that he built the house on the lot in dispute, under a contract which was presented to him by Baughman, on behalf of Mrs. Greer, she being first introduced to the witness by him; that the contract for the building was signed by the witness and Mrs. Greer, and witnessed by Baughman. That during the progress of the improvement several changes in the plan were made at the instance of Mrs. Greer. When the house was completed she and her son, then of age, and Mr. Baughman's family occupied it or moved into it. The witness received his payments from G. Baughman. At the commencement of the building, Mrs. Greer told the witness the money which she had for the building was invested in stock, and that she always wanted a few days' notice when he wished for money. He accordingly always gave notice to Baughman, who Mrs. Greer said was to act as her agent.

In the spring of 1843, Baughman offered the witness $300 of stock in payment, which he declined taking. The certificates of stock were handed to him, when, to the best of his re-

Greer *vs.* Baughman, *et al.*

collection, he saw the name of Mrs. Greer on them, and to the best of his recollection it was Baltimore and Ohio Rail Road stock.

The proof shows, that on the 17th of February 1843, Sloan, White & Co. agreed, in writing, to furnish L. G. Shipley, on account of G. Baughman, twelve hundred dollars in lumber, for which they agreed to receive in payment city of Baltimore six per cent. stock, at $107 to the hundred, and that they would also receive in payment of Mr. Baughman's account, amounting to $227.14, city six per cent. stock, at the same price; all of said stock to be delivered on or before the first of May then ensuing. And, "in the event of Mr. Shipley's failure to complete Mr. Baughman's house, according to contract," it was agreed to return to Baughman the residue of the stock which might be due after deducting the amount of Shipley's account, together with Baughman's account due at the date of the agreement.

On this agreement is the following endorsement:

"Rec'd of Mr. George Baughman, this 2nd day of May 1843, a certificate of city six per cent. stock for thirteen hundred and thirty-three dollars $\frac{78}{100}$, with twenty dollars interest on same from 1st July, being agreeable to the within statement.                    SLOAN, WHITE & Co."

C. B. White, of the firm above mentioned, testifies, that on one occasion Baughman told him, or he was led to believe, from what Baughman told him, that he was making the investment for his mother-in-law. This was when witness called on Baughman for a transfer of city stock, under the contract, and he then said the money, or stock, or notes belonged to his mother-in-law, and he was making the investment for her.

It appears, from the testimony of the deputy register of the city of Baltimore, that on the 29th of April 1843, by the order of G. Baughman, there was transferred to Sloan, White & Co., $1333.78 of six per cent. stock of the city; and in addition to this, the witness says, "there was more stock than that."

The transfer clerk in the office of the Baltimore and Ohio

Rail Road Co. testifies, that no stock of said company has been standing in the name of Mrs. Greer from the year 1840. And there is no evidence that she ever had stock *of any kind standing in her name.*

N. L. Wood says, he was applied to by Baughman for a lot for his mother-in-law, and as agent for J. H. McHenry, the witness agreed to lease the lot now in dispute, which he entered in his book to G. Baughman, without taking any notice in the book of who it was for, and the son of the witness drew the lease according to the entry in the book. After the lease was executed, it was handed to Baughman, and he said "it made no difference as he could make an assignment of the lot to Mrs. Greer." The impression is strong on the mind of witness, that the whole transaction was for Mrs. Greer. Baughman told witness that she had some money which she wanted to invest in a house, and he was doing the business for her.

Except L. G. Shipley, Baughman is the only witness who gives any testimony tending to show, that Mrs. Greer's means or funds were applied to the payment of improving the property. And what Shipley says in regard to this is, that she told him the money she had for building, was invested in stock; that she always wanted a few days' notice when he desired payment, and that Baughman was her agent. Shipley also says Baughman once offered him $300 in stock, which he did not take. He thinks it was Baltimore and Ohio Rail Road stock, and to the best of his recollection he saw Mrs. Greer's name on the certificates. In this however he must have been mistaken, as the proof is, that she had no such stock in her own name since 1840.

According to Baughman's testimony, as already stated, Mrs. Greer had funds, which as her agent he invested in stocks, in his own name, and with those means the improvements were paid for. This, however, is evidence coming from a witness deeply interested in defeating the claims of his creditors, for the benefit of his wife and children. And it is unsatisfactory on account of the facility with which it may be fabricated, and on account of the difficulty of investigating or contradicting

35    v. 13.

it, as no corroborating circumstances are produced, other than the mere declarations of Mrs. Greer herself.

This witness, on cross-examination, says, he *believes* that Mrs. Greer, as heir at law of the estate of Caleb Hall, at sundry times before and after the marriage of the witness, did receive moneys from that estate. He merely states his belief on this subject; and without intimating how long before or after the marriage the moneys were received. Nor does he give us the slightest information, professing to be derived from any record evidence relating to Mr. Hall's estate, or as to who was the representative of the estate, by whom the moneys were paid. It is not probable that the witness was wholly uninformed in these respects, if he had such information as justified him in believing what he has stated, with regard to the receiving of moneys, spoken of by him.

Moreover, the testimony in support of the allegation, that Mrs. Greer had the means with which she could and did pay for the improvements, is not uncontradicted by other evidence. For surely the testimony of Josiah Cobb, Joshua Dryden, Joseph Baugher and Mary D. Turner, in relation to Mrs. Greer's circumstances and condition in life, is quite sufficient to create a very serious doubt, at least, whether she possessed the means which could enable her to make the requisite payments.

J. Cobb knew Mrs. Greer for more than thirty years. He knew her before and subsequently to the death of her husband, which he thinks occurred prior to the year 1830. After becoming a widow she dealt with witness, as a grocer, for a number of years. She had an account with him up to 1834 or 1835. He considered her honest as far as her means went, and she was a genteel woman, but appeared to be in straightened circumstances. Up to the year 1834, she owed witness a balance of $20.90, which he thought a pretty large balance for a person in her circumstances, and as large as he could afford to lose, and of course he desired that it should not be enlarged. She afterwards made two payments of five dollars each, on this debt, and the balance remained unpaid. She frequently spoke of her indebtedness to him, and of her wish

to pay it when she should be able. He never pressed for the money, and never would have pressed her for it. The two payments made were voluntary on her part. The witness has known her since the above transaction, but knows nothing of her circumstances. After Baughman married her daughter, all that was bought from witness was bought in Baughman's name. In making her purchases, after that marriage, Mrs. Greer would come with Mrs. Baughman, and the goods that she purchased were always charged to Mr. Baughman, and it was easy to see that the purchases were made for his family. Witness has no positive knowledge that Mrs. Greer, was assisted by her friends from 1834 to 1847; he never knew that she had any business during that time, though it is his impression that she had a few boarders, which helped her to pay her rent. She lived economically. Her general reputation with regard to payment was rather against her, because she was poor and could not meet her bills with promptitude. For four or six years after 1834, witness saw her frequently, since then, not so often. She was a proud woman, and, from his knowledge of her character, he does not think that she would have done any business beneath her. He thinks that if she had been in the rag or iron business he would undoubtedly have heard of it. He thinks, also, that if she had been in such business and had made money, she would have paid him the balance which she owed him, from her voluntary assertions from time to time.

Joshua Dryden says, he has known Mrs. Greer, from shortly after the marriage of her daughter to Mr. Baughman, "which he thinks took place about twelve or thirteen years ago;" (that is twelve or thirteen years prior to December 1855.) Very shortly after the marriage Mrs. Greer rented and occupied, for about a year, a house belonging to the witness. He knows nothing of her circumstances, only that she was tardy in paying her rent; but he always received it at last. He has no knowledge as to what property she had; and only knows her by having called on her to ask for his rent. She never let two quarters of rent be in arrear, though she was tardy. He thinks if she had owned property she would not have put him off so

frequently. There was always property enough to pay the rent by distress, if witness had been inclined to levy one. The rent was $250 a year. He thinks that after leaving his house Mrs. Greer went to live with Mr. Baughman.

Joseph Baugher testifies, that he has no knowledge of Mrs. Greer's circumstances, except from what was communicated to him by her son-in-law, G. Baughman. He complained to the witness that he was obliged to support her and a son of her's also. These complaints were made several times, perhaps frequently, from the first of January 1844, down to 1846 or 1847. Baughman and witness were on intimate terms. He has heard Baughman say, that the house was building out of the ladies' pin money, by which witness understood him to mean the money furnished for house-keeping.

Mary D. Turner says, she knew Mrs. Greer from 1839 down to 1842, who was then a widow. During that time the circumstances of Mrs. Greer were limited. Witness thinks they were so, because she refused to take a boarder, unless the lady as a boarder would furnish her own room; Mrs. Greer stating that she was not able to furnish it. The application for board was made by the witness in behalf of a friend, a Mrs. Gregory. She did furnish her own room, and boarded with Mrs. Greer about a year, when she broke up, stating to Mrs. Gregory, that she was not able to keep a boarding house. She kept lady boarders till then, but not to any great extent. She was then living in a house of Mr. Dryden's; and witness was in the house every week. It was plainly furnished.

On cross-examination, Mary D. Turner says, her statement is from her own knowledge. She made the contract for Mrs. Gregory, and heard Mrs. Greer say, that Mrs. Gregory must furnish her own room, as she was unable to furnish it; and also heard Mrs. Greer say, she was not able to keep boarding house. Witness has no knowledge of Mrs. Greer's circumstances, except from the particulars stated.

Should it be conceded, that in such a case as this a resulting trust may be established by parol proof, if sufficiently clear and convincing, we do not consider the present proof is of such

Greer *vs.* Baughman, *et al.*

a character; and therefore we must decide adversely to the claim of Mrs. Greer.

. We deem it proper to remark, that there is no evidence of any sum having been paid as purchase money, for the lease of the property, either by Mrs. Greer or by any one else. The lease contains a covenant for payment of rent as it might accrue, and such other covenants as are usually found in like instruments. There is none requiring the lessee to make improvements. The lessor covenants, that at any time within ten years from the date of the lease, if it shall continue to exist, the property shall be conveyed, in fee-simple, to G. Baughman, his heirs or assigns, on his or their paying or tendering in payment, to the lessor, his heirs or assigns, the sum of $2500, and all arrearages of rent. But there is no pretence that any part of the $2500 has been paid or tendered.

The property in contest was attached, in several cases, as the property of G. Baughman. By agreement of counsel the proceedings in those cases were before us, and from them it appears there are several judgments upon such attachments, in favor of some of the defendants in this case, as creditors of G. Baughman. One of the largest of them is based upon a claim, bearing date prior to the assignment from Baughman to W. J. Ward, in trust; and some of those judgments were rendered on claims created after the execution of the assignment, but before it was recorded.

The parties agreed that the court should decree a sale of the property in dispute; and such a decree was passed. A sale having been made accordingly, the proceeds were brought into court, and it appears that the nett balance thereof is $3504.24.

There is no evidence, whatever, that Baughman, either at the date of the assignment, or since, had any other property than that in controversy. This being so, neither his wife nor his children can have any claim to the property or proceeds thereof, in opposition to his creditors, who have judgments on attachments, based upon claims existing prior to the date, or previous to the recording of the assignment. And such creditors, we think, are entitled to have the fund in court applied to the payment of their claims, according to their respective priorities.

By the decision below the bill was dismissed, and the counsel for the creditors seemed to think, if this court should be of opinion that Mrs. Greer has no claim, the decision below ought to be affirmed. But inasmuch as the nett proceeds of the property are in court, under the circumstances stated, we deem it proper to remand the cause to the Superior court of Baltimore city, without reversing or affirming the decree, for the purpose of having the fund in court applied, according to the views announced in this opinion.

In *Griffith vs. Buck, & others, Ante,* 102, the property in controversy, or a portion of it, was sold by a receiver, and the proceeds, with other funds, were brought into court. Upon appeal the injunction in the cause was dissolved, the order appointing the receiver was reversed; and although it was decided, that the sole complainant in the bill had no claim whatever, the cause was remanded without dismissing the bill. This was done in order that the funds in court might be properly disposed of under the direction of the court.

It is shown, by the agreement of counsel, that the motion to transfer the cause from the Superior court, sitting as a court of equity, to the Circuit court for Baltimore city, was made after the judge of the Superior court had pronounced his opinion, dismissing the bills filed in said cause. This being so, we think the motion to transfer was properly refused.

What has been said in the foregoing opinion, disposes of the appeal taken by Mary Greer, complainant in the original bill, and also of the appeal taken by Mary Jane Baughman, and others, complainants in the cross-bill.

*Cause remanded, under the act of* 1832,
*ch.* 302, *without reversing or affirming.*

(Decided March 31st, 1859.)