## HELEN V. DIXON

*vs.*

## JAMES S. DIXON, HELEN S. DIXON, NANNIE DIXON AND W. LEE DIXON.

*Resulting trusts: payment of purchase money; title in another; presumptions; proof. Grantor and grantee: declarations after the deed; when not admissible in evidence. Title to land: reputation.*

When the purchase price of land is paid by one person and the title is taken in the name of another, a resulting trust arises in favor of the person paying the purchase price, and the holder of the legal title becomes a trustee for him.      p. 55

But where one purchases land with his own money and causes the title to be placed in the name of one for whom he is under a natural or moral obligation to provide, no presumption of resulting trust arises.      p. 55

In such a case, it is regarded *prima facie* as a gift or advancement for the benefit of the nominal purchaser.      p. 55

In either case the presumption is one of fact and not of law, and the real intention of the parties may be shown, and be given effect, provided it does not contravene some rule of property, or policy of the law.      p. 55

Payment, or advance of the purchase money, before or at the time of the purchase, by the party claiming the trust, is indispensable.      p. 58

Such payment is the foundation of the trust and must be made out by plain, direct and unequivocal evidence.      p. 58

The evidence establishing a resulting trust should be clear and satisfactory.      p. 66

Mere parol evidence to establish such a trust should be received with the greatest caution.                     p. 58

In general, the declarations of a grantor or vendor made after the conveyance, are not admissible to impeach the title of the grantee.                     p. 59

But where creditors are seeking to annul a conveyance, on the ground of fraud, if evidence is offered to show *prima facie* a case of combination, or conspiracy between the grantor and grantee to defraud creditors, the declarations of the grantor, made after the deed, may be admitted.                     p. 59

While the general reputation as to the ownership of property may sometimes be admitted for certain purposes, it can not be received in evidence to prove title, or to establish a resulting trust.                     p. 59

*Decided March 18th, 1914.*

The facts are stated in the opinion of the Court.

Appeal from the Circuit Court for Dorchester County. In Equity.  (STANFORD, J.)

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*T. Sangston Insley* and *Emerson C. Harrington,* for the appellant.

*Joshua W. Miles* and *Clement Sullivane,* for the appellees.

BURKE, J., delivered the opinion of the Court.

On the 9th day of May, 1865, Thomas I. Dail and wife, by deed duly executed and acknowledged, granted and conveyed, in consideration of the sum of five thousand dollars, to Richard H. Dixon, of Dorchester County, a lot of ground and improvements mentioned and referred to in the deed, situated on High street, in the town of Cambridge.  This

deed was not recorded until the 6th day of March, 1899. On the 17th day of January, 1907, Richard H. Dixon, "in consideration of five dollars, and other good and valuable considerations," granted and conveyed the property to his wife, Helen V. Dixon. This deed was recorded among the Land Records of Dorchester County on January 18th, 1907. The deed also conveyed to her all household and kitchen furniture in his dwelling on High street. Helen V. Dixon, the grantee in the deed, was the second wife of Richard H. Dixon. He was married to her in November, 1885, and she is the sole defendant in this case.

By three deeds dated, respectively, April 27th, 1909, December 28th, 1909, and December 6th, 1910, Helen V. Dixon, and Richard H. Dixon, her husband, granted and conveyed to certain persons named in the deeds parts of the property conveyed to the defendant by the deed of January 17th, 1907,—these parts being a portion of the lot conveyed to Richard H. Dixon by the deed from Dail and wife, above referred to. The aggregate sum realized from these sales was $3,350.00. This purchase money was received by the defendant, except the sum of $450.00—being the purchase price of the portion sold to Delia Bayly Orem. This sum was received by her husband.

About the year 1855, Richard H. Dixon married his first wife, Eliza Stewart. She was the only daughter and heir-at-law of John H. Stewart, who was considered to be a prosperous farmer of Dorchester County and who died intestate in the year 1856, leaving surviving him his wife, Rebecca H. Stewart, and his daughter, Eliza S. Dixon.

John H. Stewart was the owner of two farms in Dorchester County, upon one of which he resided at the time of his death. The total appraised value of his personal estate, as shown by the inventory filed in the Orphans' Court for Dorchester County on February 26th, 1856, was $4,723.30, consisting of household and kitchen furniture and farming implements appraised at $1,723.00, and nine slaves appraised at $3,000.00. The slaves subsequently became the property

of Richard H. Dixon and were afterwards emancipated. The account of the administrator shows the distribution of the estate as follows: "To Rebecca H. Stewart, widow of deceased, one-third of balance, $1,541.02/3; to Eliza, wife of Richard H. Dixon and only child of deceased, two-thirds of balance, $3,000.00." The estate was evidently distributed in kind—Mrs. Dixon receiving the slaves.

Upon the death of John H. Stewart, his real estate passed by descent to Eliza S. Dixon, subject to the dower interest of her mother, Rebecca H. Stewart. On the twenty-fourth day of October, 1856, Eliza S. Dixon and Richard H. Dixon conveyed said real estate to Rebecca H. Stewart, and on the same day Rebecca H. Stewart reconveyed said property (being the farms mentioned and all the land owned by John H. Stewart at the time of his death) to Eliza S. Dixon for life, and after her death to Richard H. Dixon in fee. Each of said deeds recited a consideration of $10,000.00 current money. So far as disclosed by the record this real estate and the property shown by the final distribution comprised the whole estate received by Rebecca H. Stewart and Eliza S. Dixon from John H. Stewart, and it is not shown that they were then possessed of any other property or money.

The father of Dr. Richard H. Dixon was James Dixon, of Dorchester County, who died about two years after the marriage of his son to Miss Stewart. The evidence shows that he was a man of considerable means. Prior to his son's marriage he purchased for him and had conveyed to him a farm called "Indian Purchase," which Dr. Dixon afterwards called "Sunnyside." It also appears that he furnished the necessary live stock and farming implements for conducting the farm work.

Under the will of his father, Dr. Dixon was devised his father's interest in some property called Goose Creek Lands, and a legacy of $2,000.00, consisting of securities to be taken by his executors for the purchase price of his real estate which he directed them to sell. He was bequeathed certain slaves appraised at $2,100.00, and other personal property

appraised at $175.00. The slaves and the personal property were distributed in kind to Doctor Dixon in July, 1860, and the second distribution account filed August 1st, 1860, shows the payment of the legacy of $2,000.00. Dr. Dixon was one of the executors of his father's will, and the record shows that he received in legacies and commissions from his father's estate the sum of $5,766.22.

After the death of John H. Stewart, Doctor Dixon and his family moved from Sunnyside, where he had lived from the time of his marriage, to the farm upon which Mr. Stewart lived at the time of his death. In September, 1863, he sold the Sunnyside farm to Joseph H. Wright for $5,000.00, to be paid in five equal instalments—the first falling due January 1st, 1864, and the others annually from the day of sale. On September 21st, 1863, Mr. Wright, to secure the payment of the purchase money, confessed a judgment in the Circuit Court for Dorchester County. Credits were entered on this judgment as follows:

1864, November 9th, by cash............... $550.00
1865, January 30th, by cash............... 200.00
1866, January 18th, by cash............... 130.00
1866, April 4th, by cash.................. 500.00
1867, January 11th, by cash...............1100.00

and on March 15th, 1867, Dr. Dixon assigned the balance due on the judgment to Caleb S. Maltby.

Dr. Dixon moved from the farm and took possession of the Dail property soon after its purchase, and occupied the dwelling house thereon until his death on April 15th, 1912.

Dr. Dixon's first wife died in 1867, leaving surviving her her husband and four children, the oldest of whom was about ten years old and the youngest about two years old. The family of Dr. Dixon consisted of his wife and four children, his mother and Rebecca H. Stewart, his mother-in-law. Both his mother, who was possessed of considerable means and who appears to have been at all times ready to aid her son in a financial way, and Mrs. Stewart died before his marriage to the defendant.

One of the children, Helen S. Dixon, left home in 1892, and has never returned. Her father and the defendant, however have each rendered her financial aid. She is one of the plaintiffs in this suit, but does not appear to have taken any active part in its prosecution. W. Lee Dixon continued, with unimportant intervals, to reside with his father until 1895, when, in consequence of serious financial embarrassments which involved his father and greatly distressed him, he left the State and did not return until after his father's death. The other two children, with slight exceptions, lived with their father until his death, and one of them, James S., lived in the home for sometime after his father died. Dr. Dixon left two children by his second wife: Robert H. Dixon, Jr., born August 23rd, 1886, and Marie Dixon, born December 3rd, 1890.

On the 23rd of April, 1913, the original bill in this case was filed. The substantial allegations of the bill were:

1st.—That in or about the month of May, in the year 1865, a certain Eliza S. Dixon, wife of Richard H. Dixon, both of Dorchester County, State of Maryland, being in possession of a large sum of money and desirous of purchasing a home in Cambridge, in the county aforesaid and learning that one Thomas I. Dail wished to sell a house that suited her, and would take $5,000.00 therefor, intrusted her husband with that amount of money, with the request that he buy the said property for her.

2nd.—That the said Richard H. Dixon proceeded to buy said property from the said Thomas I. Dail as directed, and paid for it with the said moneys furnished as aforesaid by said wife for that purpose, but instead of having the deed therefor made to his said wife, as both in law and in equity he was bound to do, he caused it to be made to himself as if he was the purchaser and not the said Eliza S. Dixon.

3rd.—That having thus fraudulently secured the legal title to the said house and lot in himself, the said Richard H. Dixon secreted the said deed for over thirty-three years and never did reveal the fact of its existence until he filed it in

the office of the clerk of this Court in the month of March, in the year 1899.

4th.—That the said Eliza S. Dixon departed this life intestate in the year 1867, as aforesaid, leaving four infant children and her said husband surviving her, the said children being likewise the children of the said Richard H. Dixon, and being the plaintiffs in this suit; that the plaintiffs were the sole heirs-at-law of their said mother, and upon her death, entitled to the said house and lot, subject to the life estate therein of their said father.

5th.—That the plaintiffs and their father after the decease of the said Eliza S. Dixon continued to reside on and occupy said property until Helen S. Dixon went abroad to reside and W. Lee Dixon went to Virginia, etc.

6th.—That the said defendant, Helen V. Dixon, well apprised of the foregoing facts, or at least having ample information thereof to put her on inquiry, did, in the year 1907, wickedly induce and persuade her husband, who had become old and infirm, to execute to her without any real consideration a deed of conveyance of all of said property in fee simple, though he well knew, ought to have known, and could have known, that he had only a life estate to convey.

7th.—That in the year 1909 the said defendant, in order, as your orators believe and therefore aver, that she might dispose of said property and pocket the proceeds before the death of her husband, and before the plaintiffs could lawfully intervene and assert their title and claim to the possession of the property because of her estate therein for the life of the said Richard H. Dixon, sold and conveyed portions of said property to certain persons named in the bill.

8th.—That the plaintiffs are advised, and therefore allege, that by reason of the foregoing facts the defendant is not an innocent purchaser of said property for value; that she only held an estate for the life time of Richard H. Dixon, and should be compelled by decree to vacate said dwelling house and lot and convey the same to the plaintiffs, and also to pay over to them in the proportions to which they are entitled

the money she has received from her sale of the portions of said property.

The relief prayed for was that a decree be passed requiring the defendant to "vacate the dwelling house and lot aforesaid, and convey the same to your orators, and also to pay over to them the moneys received by her from the aforesaid sales of their property, and that a multiplicity of suits may be avoided; and that your orators may have such further and other relief, as the case may require."

An answer was filed by the defendant. It is unnecessary to discuss its averments with any particularity. It is sufficient to say that it is full and complete, and specifically denies all the essential allegations of the bill, and in addition, relies upon laches and limitations as a bar to the relief prayed. On October 9th, 1913, the plaintiffs asked leave to amend the bill and stated in the petition filed for that purpose: "That they cannot sustain by proof their allegation in paragraph 8 of their bill that the defendant gave to her husband as a reason for a conveyance to her a fee simple title to the property in dispute, that he could prevent the creditors of W. Lee Dixon, for whom he was surety, from selling the property, and they desire to withdraw said allegation, and to that end make an amendment to the bill by striking out the said '8th' paragraph, and renewing the same by omitting said allegation and making other changes in the verbiage necessitated by the amendment, but in no way affecting the substance and object of the bill." They prayed leave to amend by striking out the 8th paragraph of the bill, and substituting the following paragraph in lieu thereof: 'That the said Helen V. Dixon, well advised of the foregoing facts, or at least having ample information to put her on inquiry by which she could have discovered the same, did, in the year 1907, induce and persuade her husband, the said Richard H. Dixon, to execute to her without any valuable consideration a deed of conveyance of all of said property in fee simple, though he knew, and she knew or ought to have known, and could have known, that he had only a life estate to con-

vey, but whether she knew it or not he did so convey to her the said property in which there was a resulting trust in favor of the said Eliza S. Dixon originally, and at her death in favor of her heirs-at-law, the plaintiffs in this action, and by reason of all the aforesaid, the said Helen V. Dixon, she being a volunteer, took the said property impressed with said trust.'" The bill was amended as prayed under an order of Court. A replication was filed and the testimony of the parties was taken before an examiner.

After full argument the learned judge in the Court below filed an elaborate and well-considered opinion in which he, after reviewing the facts and the law of the case, concluded that the property conveyed by Dail and wife to Richard H. Dixon by the deed of May 9th, 1865, was impressed with a trust for the benefit of the plaintiffs as heirs-at-law of Eliza S. Dixon. This conclusion was based upon the fact, as found by him, that she furnished the consideration for the deed. In conformity to this opinion the following decree was passed: "This case standing ready for hearing and being submitted, the counsel for the parties were heard and the proceedings read and considered, and it clearly appearing to the Court that Eliza S. Dixon, mother of the plaintiffs, furnished the money therewith to purchase the certain property described in the deed, of which the Plaintiff's Exhibit No. 1 is a copy, offered in evidence, though the said deed names her husband, Richard H. Dixon, as grantee therein; and it further appearing that said property was conveyed to the defendant, Helen V. Dixon, under a voluntary deed, of which the Plaintiff's Exhibit No. 2 is a copy, offered in evidence; and it further appearing that subsequent to the execution and delivery as a gift of the said last named deed, the defendant conveyed certain parts of said property unto innocent purchasers of said parts and received from said innocent purchasers the sum of $900.00, as of the 28th day of December, 1909, and the further sum of two thousand as of the 6th day of December, 1910, which sums were converted by her to her own uses and purposes; and it further appearing that the said Richard H.

Dixon departed this life before the institution of this suit, and the said Eliza S. Dixon likewise departed this life in the year 1867, leaving the plaintiffs as her sole heirs-at-law. It is thereupon, this 1st day of September, in the year 1913, by the Circuit Court for Dorchester County, in Equity, adjudged, ordered and decreed that the plaintiffs are entitled to relief in the premises, and that the defendant, Helen V. Dixon, by a good and sufficient deed to be executed and acknowledged and recorded, agreeable to law, shall convey unto said plaintiffs and their heirs the land and premises in the proceedings mentioned and described, as conveyed by the aforesaid Richard H. Dixon to the said defendant by deed dated the 17th day of January, 1907, except so much of said property as was afterwards conveyed by the said defendant and Richard H. Dixon unto Delia Bayly Orem by deed bearing date the 27th day of April, 1909, and to Carrie W. Ross by deed bearing date the 28th day of December, 1909, and to Ivy L. Leonard by deed bearing date the 6th day of December, 1910, mentioned in these proceedings, and all the right, title, interest and estate of the defendant in and to the same so remaining in her under said deed bearing date the 17th day of January, 1907; or, on default thereof on the part of said defendant and the delivery of said deed unto the plaintiffs on or before the 1st day of November, 1913, that Clement Sullivane be, and he is hereby, appointed trustee with full power and authority, by good and sufficient deed to be executed and acknowledged and recorded according to law, to convey to the said plaintiffs and their heirs the said property and estate clear and discharged of all claim from said defendant and of those claiming by or under her, or the said Richard H. Dixon, or either of them; and it is further adjudged, ordered and decreed that the defendant forthwith pay, or bring unto this Court to be paid, unto the plaintiffs the aforesaid sum of $900.00, with interest from the aforesaid 28th day of December, 1909, the same being the proceeds received by her from the sale to Carrie W. Ross mentioned in these proceedings, and the further aforesaid sum of

$2,000.00, with interest from the aforesaid 6th day of December, 1910, the same being the proceeds received by her from the sale to Ivy L. Leonard in the proceedings mentioned, and the plaintiffs' costs of suit to be taxed by the clerk."

This decree was on September 15th, 1913, modified so far as it required the defendant to pay interest upon the sales from the respective dates thereof, and that in lieu of such payment of interest it was decreed that "the defendant be and she is hereby required and adjudged to pay forthwith to the plaintiff, as well as the principal sum or sums of said proceeds as provided in said former decree, as also interest thereon from the said 15th day of April, 1912, and that in all other respects and particulars the defendant shall and do abide by and perform the said former decree, dated the first day of September, 1913, as fully and effectually as if the same were incorporated herein."

From each of these decrees the defendant appealed.

The record contains 1104 pages, and includes many exhibits and exceptions filed by the respective parties. In many respects, it is a most remarkable record. It was to be expected that in a family contest such as this the display of deep feeling, violent antagonism, and the usual conflict of testimony between interested parties upon material facts, would be found. "The little contentions, factions and debates" which filled up the principal drama of the family life of the parties could not be expected to be wholly excluded from the record. The record in such a contest is apt to exhibit the greed of some parties, the delusions of self-interest and partisanship, and a melancholy perversion of truth on the part of some witnesses. But it was not to be expected that the record should contain, as it does, a great mass of conflicting evidence upon matters which have nothing whatever to do with the questions presented by the pleadings. We feel safe in saying that all the material testimony of the witnesses in the case could be embraced in 300 pages of the record.

The plaintiffs by their original and amended bill seek to establish a resulting trust in their favor as to the property embraced in the deed from Thomas I. Dail and wife to Richard H. Dixon, and it becomes necessary to state briefly, first, the principles of law as to the creation of resulting trusts; secondly, the character of proof required to establish them; thirdly, the admissibility of evidence to establish such a trust in a case like this. After ascertaining the general principles of law and evidence applicable and controlling in this case, the facts disclosed by the record will then be examined in the light of those principles.

The general rule is well settled that when the purchase price is paid by one person and the title is taken in the name of another a resulting trust arises in favor of the person paying the purchase money, and the holder of the legal title becomes a trustee for him. There are, however, exceptions to this general rule: Thus, where a person purchases land and pays the consideration with his own money, but causes the title to be placed in the name of one to whom the purchaser is under a natural or moral obligation to provide, such as in the case of parent and child, or husband and wife, no presumption of a resulting trust will arise, but it will be regarded *prima facie* as a gift or an advancement for the benefit of the nominal purchaser. In either case, the presumption is one of fact and not of law, and the real intention of the parties to the transaction may be shown, and the Court will give it effect if it does not contravene some rule of property or the policy of the law. If a husband purchases real estate in his own name with money furnished by his wife from her separate estate, a resulting trust in her favor arises by implication of law. The authorities are practically unanimous in support of these propositions.

In *Dorsey* v. *Clarke et al.*, 4 H. & J. 551, a case frequently cited upon this subject, the Court said: "If a man purchases an estate and pays the purchase money, but takes the deed in the name of another, a trust results by construction of law

to the man who paid the money; and if the nominal pur-
chaser refuses to execute a declaration of trust, the payment
of the consideration money may be proved by parol, as before
the statute. The payment of the money is the foundation of
the trust," and in *Thomas* v. *Standiford,* 49 Md. 182, the
Court adopted the following rule announced by the lower
Court in that case: "There is, perhaps, no principle more
clearly settled by numerous authorities than that if a hus-
band purchases an estate with the money of his wife, there
is a resulting trust, and the husband holds the property as
trustee for the benefit of his wife." In *Johnson* v. *Johnson,*
96 Md. 144, JUDGE JONES said: "Where one party purchases
an estate and pays the money, and the deed is taken in the
name of another, a trust results by construction of law to the
party who paid the money, and such payment may be proved
by parol." *Witts* v. *Horney,* 59 Md. 584. "If only a part
of the purchase money be paid by a third party, there will
be a resulting trust in his favor *pro tanto.*" 4 Kent. 306
(Marg. 11th ed). The rule of law thus laid down is subject,
however, to this qualification: "If the person in whose name
the conveyance of property is taken be one for whom the
party paying the purchase money is under a natural or moral
obligation to provide, no equitable presumption of trust
arises from the fact of the payment of the money, but, on the
contrary, the transaction will be regarded, *prima facie,* as an
advancement for the benefit of the nominee. In that case,
therefore, it will be for the party who seeks to establish a
trust in behalf of the payer of the purchase money to dis-
place, by sufficient evidence, the presumption that exists in
favor of the legal title." Accordingly, it is held that: "If
a parent should purchase in the name of his son, the purchase
would be deemed, *prima facie.* as intended as an advance-
ment so as to rebut the presumption of a resulting trust. But
this presumption that it is an advancement may be rebutted
by evidence manifesting a clear intention that the son shall
take as trustee"; but it "ought not to be frittered away by

nice refinements." "A like presumption exists in the case of
the purchase by a husband in the name of his wife. Indeed,
the presumption is stronger in the case of a wife than of a
child; for she cannot at law be the trustee of her husband."
*Mutual Fire Ins. Co.* v. *Dale,* 18 Md. 26, and authorities
there cited. In 1 *Perry on Trusts,* sec. 147, it is said that
"whether, in the class of cases last mentioned, the purchase is
to be considered as an advancement or settlement or not is a
question of pure intention, though presumed, in the first in-
stance to be a provision and settlement." A clear exposition
of the doctrine is found in the case of *Bailey* v. *Dobbins et
al.,* 67 Neb. 548; S. C. 93 N. W. 687, in which the Court
said: "Generally speaking, where the purchase money of
land is paid by one person, and the title is taken in the
name of another, the party taking the title is presumed to
hold it in trust for him who pays the purchase price. The
reason given for this rule is that the party who pays the
money is presumed to intend to become the owner of the prop-
erty, and the benefit of title follows such intention. This
presumption, however, does not arise where the legal title is
taken in the name of some person for whom the purchaser is
under a legal or moral obligation to provide. In such case
the presumption arises that the conveyance was intended as
an advancement to the nominal purchaser. The foregoing
will be recognized as elementary. Whether the conveyance
be to a stranger, or to one for whom the purchaser is bound
to provide, the presumption arising therefrom is not of law,
but of fact, which may be rebutted by evidence tending to
show that the intention of the purchaser was different from
that to be inferred from the bare fact of such conveyance.
This, also, is elementary. Hence, in either case, when it
appears that the purchase money has been paid by one person,
and a title taken in the name of another, the question is
whether it was intended that one to whom the conveyance
was made should take the entire estate, or that the one pay-
ing the purchase price should hold the equitable title to the

property. When the intention in that behalf is ascertained, the Courts will give it effect, if possible." In *Walsh* v. *McBride,* 72 Md. 45, it is stated that: "In all species of resulting trusts, intention is an essential element, although that intention is never expressed by any words of direct creation. 3 *Pomeroy's Eq.,* sec. 2031. As the trust results to the real purchaser by operation of law, which is merely an arbitrary implication in the absence of reasonable proof to the contrary, the nominal purchaser is at liberty to rebut the presumption by the production of parol evidence, showing the intention of conferring the beneficial interest. The trust will not be raised in opposition to the declaration of the person who advances the money; nor in opposition to the agreement of the parties on which the conveyance is founded; nor to the obvious purpose and design of the transaction."

"Payment or advance of the purchase money by the party claiming the trust, before or at the time of the purchase, is indispensable." *Hays et al.* v. *Hollis,* 8 Gill, 357; *Hollida* v. *Schoop,* 4 Md. 465; *Brawner* v. *Staup,* 21 Md. 328. "It is held in all the cases that the payment, which is the foundation of the trust, must be made out by plain, direct, and unequivocal evidence." *Keller* v. *Keller,* 45 Md. 269; *Thomas* v. *Standiford,* 49 Md. 181; *Greer* v. *Baughman,* 13 Md. 257.

When the plaintiff relies upon mere parol evidence to establish the trust the "Court should view with the greatest caution such evidence impeaching, as it does, solemn instruments, the evidence of title to land. The authorities," say the Court in *Dorsey* v. *Clarke,* 4 H. & J. 557, "are clear that the payment of the money by the *cestui que trust* must be clearly proved; otherwise, you render insecure titles depending upon deeds and other written instruments." *Faringer* v. *Ramsay,* 2 Md. 365. Testimony of witnesses, based merely upon memory as to oral statements made by persons since deceased should be received with great caution, and if a long time has elapsed since the alleged statements, such testimony

is held to be most unsatisfactory and inconclusive. In many cases the Courts have spoken of the caution with which such evidence should be accepted as correct, and have stated the reasons therefor. In an elaborate note to *Wilbur* v. *Tooth-aker,* 18 Am. & Eng. Anno. Cas. 1190, the weight to be given to testimony based on memory or oral statements is considered, and many cases in England and America are cited.

It is a general rule that declarations of a grantor or vendor, made after the conveyance, are not admissible in evidence to impeach the title of the grantee. This general rule is elementary. But there is an exception to it in cases where creditors are seeking to annul the conveyance upon the ground of fraud. In such cases, where evidence is offered tending to show a *prima facie* case of combination or conspiracy between the grantor and the grantee to defraud the creditors, the declarations of the grantor, after the deed, may be admitted. *U. S.* v. *Griswold,* 8 Fed. Rep. 566; *Taylor Com. Co.* v. *Bell,* 62 Ark. 26; *Murphy* v. *Mulgrew,* 102 Cal. 547; *Walcott* v. *Keith,* 22 N. H. 196; *Piedmont Savings Bank* v. *Levy,* 138 N. C. 274. But this exception cannot be applied in this case, because in the aspect in which it is presented the rights of creditors are not involved.

All admissions of Dr. Dixon made after the deed to the defendant are not admissible to establish a trust; nor can the subsequent declarations of Mrs. Eliza S. Dixon in favor of her own title be received for that purpose. They were, besides, made out of the presence of Dr. Dixon, and upon no principle of evidence could they be received.

While general reputation as to the ownership of the property in dispute, under the facts and circumstances of the case, might be admissible as reflecting upon the question of laches, it cannot be received to prove title to the land, or to establish the trust asserted by the bill.

It follows that, under the principles stated, all the testimony contained in the record of written and oral declarations of Dr. Dixon made after the deed to the defendant, and all

the testimony of general reputation as to the ownership of the property, and all the testimony as to the declarations of Eliza S. Dixon as to her purchase and ownership of the property, must be disregarded, because inadmissible to prove title. The evidence in the case upon which the plaintiffs must chiefly rely to establish the trust is that of certain witnesses who have testified as to oral statements or admissions alleged to have been made by Dr. Dixon before the conveyance to the defendant. The case, therefore, resolves itself into a pure question of fact. It must turn upon the probative value of testimony, based exclusively upon memory as to what Dr. Dixon said: The real question is: Is this testimony of sufficient probative force, under the principle stated to warrant a decree establishing the trust as prayed?

The general character of this parol testimony will now be adverted to. Charles W. Stewart, 68 years old, who described himself as "a gentleman of leisure," and whose memory is not as good as it used to be, and who gave certain testimony calculated to affect somewhat the credibility of his evidence, testified to certain statements made to him by Dr. Dixon twenty-five years or more ago as to the ownership of the property. The witness gave three statements of what Dr. Dixon said. The first and third are as follows:

First. "I said to him, Doctor, you will soon have children large enough to look out for your interest, but it looks like, Doctor, you ought to have married a woman nearer your age —a young woman. He said, Stewart, widowers do strange things sometimes. I said, Doctor, you know you married a young woman; it looks like there will be another family of children. He said, Stewart, if I have any more children, my first children are all fixed for this property here; he said, as we got off together, it was my *first wife's* property and *her* children will certainly get it."

Third. "Coming up the street I got to boning him about getting married a second time, and told him I thought he ought to have got a woman more of his age as he had children

coming on and very likely he would have another set, marrying a young woman. Well, he says to me, Stewart, widowers do strange things sometimes. I said to him that where there are two sets of children there was apt to be squabbling or trouble over the property, especially where the man dies and leaves a widow there is mighty apt to be a squabble. He says to me, Stewart, this property here is *my wife's,* and belongs to *her* children."

Lydia Hughlett is no doubt a very honest and well intentioned lady. She testified that Dr. Dixon, after the death of his first wife, wanted to marry her, but that she would not marry him because he had no property. She was engaged to three men when she was married. Beaux were nothing to her. She had all she wanted. She testified that forty odd years ago Dr. Dixon told her "the house belonged to his children, that his wife bought it and paid for it." But the cross-examination of this witness discloses glaring inaccuracies and misstatements of facts, undoubtedly due to the infirmity of her memory, which weakened very greatly the value of her evidence. For example, she testified that in the same conversation in which Dr. Dixon told her his wife had bought and paid for the property, she said that he told her that the only property he owned was Sunnyside. The record shows that Dr. Dixon at that very time had a good deal of valuable property in fee simple, but that Sunnyside had been sold six or eight years before.

James H. Fisher, a colored man, testified that he asked Dr. Dixon why he did not paint his house, and the Doctor said "It belongs to the children." He afterwards said, "The reply was, the home did not belong to him; it belongs to the children." Mary Reid testified that her husband rented a farm from Dr. Dixon, that he came to the farm and asked her to put up some pickles. "When he asked me to put up those pickles I asked him if he was going to get married. I asked him how old the lady was. He said about thirty-five. I asked him if she had any money. He said four or five thou-

sand dollars. Then I said, Doctor, you had better be careful;
those girls marry old men for their money. Then he looked
at me and laughed, and said 'that belongs to my children·
when I am through with it.' " There is other testimony in
the case of a similar character. It is upon this kind of evi-
dence, taken in connection with the supposed ability of Mrs.
Eliza S. Dixon to pay for the Dail property at the time of
its purchase, that the Court must act. Whether Mrs. Eliza
S. Dixon was possessed of sufficient money to buy the prop-
erty is a matter of speculation or conjecture; that she was
possessed of the amount of money necessary for that purpose
does not satisfactorily appear. The evidence, however, shows
that Dr. Dixon was amply able to have raised sufficient money
to pay for the property. There is no one produced who has
any personal knowledge of the facts attending the purchase
of the property on the payment of the purchase money.
There is no writing or memorandum to throw light upon the
transaction. The deed from Dail and wife to Dr. Dixon is
*prima facie* evidence of his ownership. He claimed to be the
owner and dealt with the property in a manner inconsistent
with the belief on his part that he held it in trust. He con-
veyed it to his wife and afterwards joined with her in the
sale of portions of the property, and nearly fifty years after
the transaction, and after all the parties are dead, his four
children charge him with fraud and breach of trust, and the
Court is asked to sustain this charge upon alleged admissions
and statements of the character alluded to. The cases re-
ferred to hold such evidence, unsupported and uncorroborated
by any fact or circumstance throwing light upon the trans-
action, to be insufficient to establish the trust.

In 39 *Cyc.* 164, it is said: "As a general rule, evidence
of mere verbal admissions or statements of persons since dead,
or of the alleged *cestui que trust,* or of mere loose expressions
or admissions by the purchaser of property, such as that the
purchase money was furnished by another, or that he was
purchasing or holding for another, particularly after the

death of such purchaser or a long lapse of time, and uncorroborated by other evidence, is insufficient to establish a resulting trust, as such evidence is most unsatisfactory, on account of the facility with which it may be fabricated, the impossibility of contradiction, and the consequences which the slightest mistake or failure of memory may produce. But if such admissions or declarations are plain and consistent and especially if they are corroborated by evidence of other circumstances, as where a statement that a purchase is made for another is corroborated by proof that the purchase money was paid by such other, or by proof of a prior agreement to so purchase, they may be sufficient to establish a resulting trust."

It was said in *Greer* v. *Baughman, supra*: "The cases on this subject are examined by CHANCELLOR KENT, with his usual ability, in *Boyd* v. *McLean*, 1 John. Ch. 582. He there says: "The cases uniformly show that the Courts have been deeply impressed with the danger of this kind of proof as tending to perjury and the insecurity of paper title; and they have required the payment by the *cestui que trust* to be clearly proved." Although he states that the rule has been established by the weight of authority, which allows parol proof of a resulting trust, yet it is evident that if the point had been *res integra,* he would have been inclined to think that "such evidence is too dangerous in its consequences," and he speaks of *Gascoigne* v. *Thwing,* 1 Vern. 366, as being a salutary admonition "in regard to the caution with which such proof ought to be examined."

The decision in *Boyd* v. *McLean, supra,* was in support of the resulting trust. But it was upon strong and convincing proof, such as the Chancellor considered "decidedly in favor of the charges contained in the bill. Three witnesses declared they were present when the parties, being together, made or acknowledged the alleged agreement. In addition to this testimony as to the original transaction the contentions of the defendant to the same facts were proved by a number of other witnesses, and there were corroborating circumstances

of considerable moment. But notwithstanding all this weight of evidence before him, the Chancellor considered it proper to examine the case with much care and minuteness.

In *Lench* v. *Lench,* 10 Ves. 517, where the material evidence came from the trustee, who had been made a competent witness by a release, Sir William Grant, as Master of the Rolls, says: "She swears to no fact or circumstance capable of being investigated or contradicted, but merely a naked declaration, supposed to be made by the husband himself, admitting that the purchase was made with the trust money. This is, in all cases, most unsatisfactory evidence, on account of the facility with which it may be fabricated, and the impossibility of contradicting it. Besides, the slightest mistake or failure of recollection may totally alter the effect of the declaration." And again, on page 519, it is said: "If evidence of this sort could be proceeded upon, standing unsupported, and, in some degree, contradicted by the circumstances, it ought to stand wholly uncontradicted by other evidence."

The case of *P'Pool* v. *Thomas,* 8 S. W. 198, is in many respects strikingly alike the case before us. It appeared that in 1859, a Mr. Miller conveyed to C. C. Thomas a tract of land in Kentucky containing 200 acres. Thomas and his wife, Mary Anne, moved upon the land in 1859, and resided thereon as their home. In 1876 Mrs. Thomas died, and in the same year C. C. Thomas married Amanda C. Thomas, with whom he lived until 1885, when he died. By Amanda C. Thomas he had two children, one of whom is living. C. C. Thomas left a will by which he devised to Amanda C. Thomas said tract of land during her life and the remainder to his children by Amanda C. Thomas and Mary Anne Thomas. Amanda C. Thomas renounced the provisions of the will and claimed a homestead in the said land which, not being worth over $1,000.00, was alloted to her as a homestead. The children of C. C. Thomas by his first wife, Mary Anne, instituted a suit in equity against Amanda C. Thomas and

her child by C. C. Thomas for the purpose of setting aside the deed, and having the said land conveyed to them, upon the ground that C. C. Thomas purchased and paid for said land with money belonging to Mary Anne Thomas, by an agreement with her that the purchase was to be made for her and the deed taken to her and her heirs, but that he violated said agreement and had the deed made to himself. The bill was dismissed and upon appeal the Court said: "There is proof in the case which tends to show that C. C. Thomas agreed with his wife, Mary Anne Thomas, to use the money which she was to receive from her father's estate in the purchase of a home in this State and have the deed made to her and her bodily heirs; that after the purchase of the land in controversy, he paid for it with the money that he received from her father's estate; that he often promised her to make her a deed to the land, and that but a short time before her death told her that he had done so. On the other hand, there is proof in the case that he said that he had paid for the land with the proceeds of a crop or crops of tobacco he had raised on the farm. The proof of the agreement consists in the recollections of the witnesses, 26 years after it is alleged to have been made, of what they heard C. C. Thomas and Mary Anne Thomas, his wife, say about it; and the proof of these witnesses does not clearly establish the fact of the agreement, but at most the evidence is moderately pursuasive that such an agreement was made. As to the payment for the land with Mary Anne Thomas' money, the proof, while it tends in that direction, by no means clearly establishes the fact, and when it is considered in connection with the proof that C. C. Thomas claimed that he had paid for the land with the proceeds of his tobacco, the dubiousness as to the trust of the matter is still more serious. While it is the established law of this State that a resulting trust may be established by parol evidence, yet it is equally well established that the evidence establishing such trust should be clear and satisfactory. It was formerly held that parol evidence was not admissible to prove that the holder, of the legal title to lands, purchased

the same with trust money and took the conveyance to himself in violation of a verbal agreement with the person for whom he was acting, whereby to raise a trust as to a title in the *cestui que trust;* but this Court, as well as others, has departed from this rigid rule and allows such trust to be established by parol evidence; but such evidence must establish a trust clearly and satisfactorily. *Snelling* v. *Utterback,* 1 Bibb. 609; *Letcher* v. *Letcher,* 4 J. J. Marsh. 593. The facts of this case illustrate the wisdom of this rule, for here, after a lapse of twenty-six years, and nearly ten years after the death of Mary Anne Thomas, and after C. C. Thomas had married again and died, leaving his second wife and only child by her, the appellants attempt to establish the trust by their own proof of the admissions of C. C. Thomas, which belongs to that class of evidence denominated as the weakest in law, which admissions at most are in general terms, and do not show with reasonable certainty that the agreement was made with his wife or that her money was actually used to pay for the land, both of which facts must concur in order to establish such a trust.

After a careful review of all the evidence, properly to be considered, we are of the opinion that it does not establish the allegations of the bill with that degree of certainty required by the law. The decree will, therefore, be reversed and the bill dismissed.

> *Decree reversed and bill dismissed, the appellees to pay the costs.*