ABRAM H. COLMARY.

*vs.*

THE CROWN CORK AND SEAL COMPANY OF BAL-
TIMORE CITY AND SADIE McSHANE COLMARY.

*Husband and wife: gifts; certificates of stock in wife's name.*
*Stock: endorsement in blank.   Evidence: erroneous*
*rulings; when no ground for reversal.*

When a man causes a certificate of stock to be issued in his
wife's name, and delivers the same to her with the intention of
giving her the stock, nothing more is required to complete an
absolute and irrevocable gift.                         p. 488

In such a case, the mere fact that the wife signed a blank
assignment of the certificate is not evidence sufficient to dis-
prove the gift.                                        p. 490

A blank assignment endorsed upon a certificate of stock,
which remains in, or is restored to, the possession of the as-
signor, is not operative and may be cancelled.         p. 490

The refusal to admit testimony offered in evidence presents
no grounds for reversal, even though erroneous, if the same testi-
mony, or other testimony to the same effect, was otherwise ad-
mitted in the case.                                    p. 490

*Decided January 12th, 1915.*

Appeal from Circuit Court No. 2 of Baltimore City. (ELLIOTT, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Frank Gosnell* (with a brief by *Marbury, Gosnell & Williams*), for the appellant.

*Wm. J. O'Brien, Jr.,* and *J. Kemp Bartlett* (with whom was *Edgar Allan Poe* on the brief), for the appellee.

THOMAS, J., delivered the opinion of the Court.

In January, 1912, the appellant filed in Circuit Court No. 2 of Baltimore City his bill of complaint against his wife, Sadie McS. Colmary, and the Crown Cork and Seal Company, in which he alleged that he was the owner of ten shares of the capital stock of said company then standing in the name of his wife and represented by Certificate No. 177 for five shares, Certificate No. 504 for four shares and Certificate No. 318 for one share; that he subscribed for the five shares represented by Certificate No. 177 in May, 1892, and subsequently purchased the one share represented by Certificate No. 318 in November, 1892, and the four shares represented by Certificate No. 504 in August, 1895; that he paid for the stock with his own money and caused the certificates therefor to be issued in the name of his wife, with whom he was then living, but that he did not intend the stock to be a gift to his wife, and that he retained absolute ownership and control of the same, collecting the regular and extra dividends which were paid from time to time, up to the time of his separation from his wife in 1908; that in causing the certificates to be issued in the name of his wife, it was his intention, while retaining complete control and ownership of the stock during his life, to allow it to become the property of his wife at his

death, in the event that he did not dispose of it, and that he had no other intention "and especially had no intention of making a gift of" the stock to his wife; that as the result of "domestic differences" he and his wife separated, and that at the time of the separation, on the 19th of November, 1908, his wife took possession of the certificates and still retains possession of them, claiming to be the owner of the stock; that he did not bring this suit sooner because of a suit by Joseph T. Fanning on certain promissory notes of A. H. Colmary & Co., payable to the order of his wife, involving "substantially the same questions," but as that suit had not been brought to trial, and the Crown Cork and Seal Company was about to declare a large dividend on its capital stock which would be collected by his wife, and as his wife was "without financial responsibility" and he would not be able to recover back the dividend on the stock, he prayed for a decree declaring him to be the owner of the stock; requiring his wife to make a proper assignment thereof to him; enjoining her from disposing of it or collecting the dividends thereon, and enjoining the company from recognizing any one except him as the owner of the stock.

An injunction was issued as prayed, and thereafter the Crown Cork and Seal Company answered the bill, admitting that the stock stood in the name of Mrs. Colmary, was represented by the certificates mentioned in the bill, and that the dividends thereon had been paid to her up to the time of the issuing of the injunction. Mrs. Colmary, in her answer admits that the stock was paid for by the plaintiff, but avers that he caused the same to be issued in her name with the intention of making an absolute gift of the same to her, and that upon receiving the certificates he delivered them to her as a gift to her, to be held by her as her property; that ever since the delivery of the certificates to her she has retained complete and absolute control over the same and collected the dividends thereon, except the dividend declared in February, 1908, to the time of the filing of the bill of complaint.

She denies that he retained ownership or control of the stock or that he collected the dividends thereon, but she admits that she endorsed some of the dividend checks and handed them to him in order that he might deposit them to her credit in savings banks in which she had at the time accounts standing in her name, to the credit of which moneys given her from time to time by her husband were deposited by her, or by him for her.    The answer further alleges that she has never seen the check for the dividend declared in February, 1908, and that she does not know to whom it was paid or that it was paid to any one; that it was not the intention of the plaintiff, in causing the stock to be issued to her and in delivering the certificates to her, to retain any ownership of or control over the same, but that the issuing and delivery of the certificates to her was an absolute gift to her, and that he told her at the time he delivered the certificate to her that he gave her the stock as her "absolute and unqualified property"; that their separation was due to the fact of his having committed adultery, and his declaration to her at the time she discovered it of his intention to persist in the commission of like offenses; that the questions involved in this case are not the same as those involved in the suit referred to in the bill, and that the bill in this case was not filed for the purpose stated, but that the subpoena was served upon her while she was confined to her bed in the hospital and suffering from a serious illness, and that the suit was brought for the purpose of harrassing and injuring her and depriving her from the income from the stock; that by reason of his refusal since their separation to contribute anything towards her support, and the injunction issued in this case, her means have become greatly reduced and "are becoming more so day by day."

The plaintiff testified that he was married in the year 1879, and at that time was employed by the firm of Clark, Parry & Co.    In 1880 he became a member of the firm, and in 1890 the firm name was changed to Clark, Colmary & Co. In 1900 he bought out the interest of Mr. Clark, and since

then the business has been continued under the name of A. H. Colmary & Co. When asked by his counsel to state the circumstances under which he purchased the stock represented by the certificates referred to, and what he did with it, he replied: "Well, I was solicited to subscribe for that stock by parties interested in the formation of the new company at that time, and I purchased it and had the stock issued in the name of Sadie McShane Colmary. I felt that it was just as safe in her name as it would be in mine; but the dividends were always sent to my office by my direction, and after having the dividend checks properly endorsed—I think sometimes I endorsed them myself for Mrs. Colmary—then I deposited those checks to my personal account in the National Howard Bank. So far as my knowledge goes there was not a single exception to that disposition of those dividend checks." After stating that Mrs. Colmary had a bank account of her own in the Commonwealth Bank, he was asked to state "whether or not when" he had the stock issued in Mrs. Colmary's name, he "intended to give her that stock or not." The question being objected to, he was then asked what he did when he got the certificates, and he replied: "At that time I had no safe deposit box, and did not have a safe, and this safe that was given to me I did not inherit it from my father's estate, as was stated; my mother had it for a number of years, and in making some changes in their apartment she thought I might need it and sent it to my office. I appreciated it as a relic of my father; and at that time I kept every paper that I had, insurances policies, papers of every class and description, in this tin box which I paid for, and for which I hold receipt for the purchase of it." He stated that the tin box was at their house, and when asked where he lived, he said: "We lived on St. Paul street for a while, then on Oak street and then on Madison street and then at the Severn. I did not specify that Mrs. Colmary should keep that box in any particular place. I bought it for keeping all my papers, insurance policies and every class of paper, and I kept them there and did not keep them anywhere else.

Where Mrs. Colmary kept them was an immaterial matter
to me, which particular part of the apartments." His coun-
sel then made the following offer: "We offer to prove by this
witness that at the time he bought the stock he did not in-
tend to make a gift of it to Mrs. Colmary, and did not give
it to her absolutely, and that she did not understand that it
was to be her stock absolutely, but that he reserved entire
control and disposition over it; intending that in case he did
not dispose of it during his life that it should pass to her
after his death." The Court sustained an objection to this
evidence, and after counsel had reserved an exception, he
asked the plaintiff when he purchased the stock, and he said
he could not remember "definitely, but could tell by referring
to——." Counsel for the defendants said he had sent for the
certificates of stock, and after they were produced, the plain-
tiff stated what dividends had been paid on the stock; that
the company had never "discontinued the payment of divi-
dends," and that Mrs. Colmary had not received any of them.
He then looked at the certificates produced and identified
them as the ones referred to. Certificate No. 177 for five
shares is as follows:

"Number 177.                              Shares, 5.
Capital Stock, $1,000,000.      Par Value, $100 each.
              THE CROWN CORK & SEAL COMPANY
                         OF BALTIMORE CITY.

     This is to certify that Sadie McS. Colmary is enti-
tled to five shares of the capital stock of The Crown
Cork & Seal Company of Baltimore City, transferable
on the books of the company on return of this cer-
tificate, duly endorsed.

     Witness the seal of the company. attested by the sig-
nature of the president, secretary and treasurer, this
4th day of May, 1892.

                    Joseph Freidenwald, President.
                    Franklin J. Morton, Treasurer.
                    W. Painter, Secretary.

(Corporate Seal)"

Certificates No. 318 and No. 504 are "in the same form," and all bear the following endorsement:

                    "Baltimore,                189—
    For value received,            hereby assign the
    within stock and certificate to
                         Sadie McS. Colmary.   (L. S.)
    Witness: Wm. F. McAvoy."

The plaintiff further stated that Mrs. Colmary's signature was to the endorsement, and that it was witnessed by "a young man who was one of the firm," and when asked when the certificates were endorsed by Mrs. Colmary, he said: "I am under the impression the same dates that are on the certificates, I think they were endorsed promptly, and that they were endorsed in blank by her." "At the time the certificates were delivered to me, they were delivered to me in person"; that they were endorsed by her at his request, "and the young man at the time of the first endorsement was bookkeeper in my office, and at the other periods he had been taken into the firm," and that he witnessed Mrs. Colmary's signature at the plaintiff's request. In reply to the question of his counsel, "What was your purpose in having her endorse the certificates in blank, after they had been issued in her name," he said, "I don't remember that, I don't remember the circumstances of it," and in reply to the question, "What was done with the certificate," he stated, "I took them home and handed them to Mrs. Colmary and asked her to take care of them, as I had done with all papers; this was no exception, I had just one place in this particular box where I kept my papers, wherever I happened to be living at the time." He also testified that he had no stocks or bonds at that time, had no safe deposit box, and had no papers which he kept in a safe deposit box; that he did not have a safe at that time, but had this tin box which was at his apartments; that he did not know exactly where it was, "anywhere that Mrs. Colmary elected to keep it was satisfactory to me; she was running the house end of it," and that he put the papers in her charge.

On cross-examination, the plaintiff stated that after his marriage he lived with Mrs. Colmary's father for a few months, and after that they boarded for a while on St. Paul street. After leaving St. Paul street they lived with Mrs. Colmary's sister for several years, and from there they went to Mrs. King's, on Madison street, to board, and remained there until they went to the Severn to live. He knew Mr. Renehan, who boarded at Mrs. King's, but did not remember saying to him that he had given Mrs. Colmary ten shares of the stock of the Crown Cork and Seal Company, and how proud he was of the good investment he had made for her, "or words to that effect." He knew Mr. Phillips, who was a boarder at Mrs. King's, but did not remember making a similar statement to him. He knew Mr. Gersting, but did not remember making such a statement to him, or telling either of the parties named, or stating in their presence, that he had given Mrs. Colmary "shares of stock in the Crown Cork and Seal Company." He knew Mrs. King, but did not remember making such a statement to her or in her presence. He knew Miss McSchane, his sister-in-law, very intimately up to 1908, but did not remember telling her, or stating in her presence, that he had given Mrs. Colmary the shares of stock referred to, and that all he can say is, "I can't remember having done it." He knew Mrs. McGraw, but did not remember telling her, or saying in her presence, that he had given the stock to Mrs. Colmary. He further stated that he could not remember when he got the safe his mother gave him, but that it was about seven years ago, or perhaps in 1907; that he got two keys with it and gave one of them to Mrs. Colmary, as he did with those papers to put it away with his "personal property," and kept the other; that he bought the tin box and paid $1.25, but could not say when he bought it; that his father died twenty-four years ago; that his mother lived on Lombard street and afterwards moved to St. Paul street and from there to the Earl Court Apartments, and it was after she moved to the apartment that the safe was sent down to him; that there was a firm safe in his office, but he did not

have a private drawer or box in it; that he frequently acted as teller at the annual meetings of the stockholders of the Crown Cork and Seal Company, and that in order to "qualify" him at those meetings he had a proxy which Mr. Cole, an officer of the company, secured for him, but that he did not have any stock placed in his name for that purpose; that the proxy was not secured from Mrs. Colmary, and that the occasions referred to were in the years 1909, 1910, 1911 and 1913. He was then asked by his counsel, "At the time when these certificates of stock were delivered to your wife, will you tell the Court whether or not you know what her understanding of what her rights in the stock were to be," and he replied, "That brings to my attention, that question of Mr. Marbury's something I had not thought of until this moment, and that is that Mrs. Colmary not only once, but quite a number of times said to me, 'Now, I understand perfectly well that this is not mine, that this money in the bank is not mine,' and if my memory serves me right, and I think it does, she even went so far as to say that, 'I would not, under any circumstances, feel that I had any right to make any disposition of it or any control over it.' She has said that repeatedly not only as to the stock but as to the moneys deposited in the savings banks."

The above is the only evidence produced by the plaintiff, and in reply, John F. Renehan testified that he had known Mr. and Mrs. Colmary for about sixteen or seventeen years; that he boarded at Mrs. King's while they were there, and that he heard Mr. Colmary "speak at the table in the presence of all of us that Mrs. Colmary owned this stock, that he bought it and gave it to her, and what a fine investment it was," and that he heard him say it a number of times. On cross-examination, in reply to the question, "There was not any question involved in the conversation as to whether it was Mrs. Colmary's or Mr. Colmary's," this witness said: "Any more than to make everybody understand that it was Mrs. Colmary's stock, and I think that was the idea he wished

to express, and I think everybody that heard it believed it to
be that way.  There was nothing concealed about it at all,
and he used to boast of it, and he went so far as to say that
he obtained the stock through Mr. Harvey Cole—I don't know
Mr. Harvey Cole—but he told how he got it, it was such a
great bargain."  Edmund L. Phillips, who had known Mr.
and Mrs. Colmary ever since he was a boy, and who boarded
at Mrs. King's while they were there, in answer to the ques-
tion, "Did you ever hear Mr. Abram H. Colmary talk about
these 10 shares of Crown Cork and Seal Company stock,"
said: "Not about the number of shares, I have heard him
speak in a general way to my father, and of course in a con-
fidential way he frequently mentioned business transactions
to him, and I happened to be present, and he said something
about making a nice present to Sadie, and he mentioned that
Crown Cork and Seal Company stock."  This witness further
stated that "Sadie" was Mrs. Colmary; that he heard him
say it two or three times, that Mr. Colmary spoke of this stock
and said he thought it was a good investment.   Mrs. Mc-
Graw, Mrs. Colmary's sister, who saw a great deal of the
plaintiff and his wife before their separation, says that she
heard Mr. Colmary say on a number of occasions that he had
given the Crown Cork and Seal Company stock to Mrs. Col-
mary in order to put her "on easy street," and that on one
occasion at the Severn, when Father Dougherty and Father
Conway were at the table, Mr. Colmary came in and threw a
check on the table and told Mrs. Colmary there was a divi-
dend, and that after the gentlemen came up-stairs she heard
them and Mr. Colmary discussing it.   Miss McSchane says
that she frequently heard the plaintiff speak of having given
the Crown Cork and Seal Company stock to Mrs. Colmary,
and that he said "that not many men were able to make such
a splendid gift to their wives," and that he very naturally
seemed very proud of it.   Mrs. Colmary, the defendant, when
asked to state when she first heard of the stock in question,
and what the plaintiff said to her, replied:  "Why those years

Mr. Colmary had been giving me handsome Christmas presents, and he had never been anything but generous with me in his gifts; he has never stinted me at all, and had never limited me with regard to prices of my clothes; he was always anxious for me to have the very nicest things. He gave me this stock simply as he had given me any other gift * * *. He gave it to me just as he gave me my diamond ring, my twin rings, and another time my watch; at another time a diamond brooch," and that she put the certificates in her bureau drawer, where she kept jewelry and other things she thought specially valuable, and which she always kept locked, but generally left the keys on her bureau. She further testified that she did not have the tix box at that time; that when he gave her the certificate in 1895 he handed it to her and told her it was a gift, and that she "enthused over it" as she always did over any gift "he gave her"; that the certificates have never been out of her "possession a moment"; that she took the bureau with her to Mrs. King's and to the Severn, and that she bought the tin box after she moved to the Severn in order to relieve "the congestion of the bureau drawer," that the tin box was kept in her side of a double wardrobe, and that she kept the certificates of stock, her notes and some little trinkets in the box; that she kept her bank books in the bureau drawer, and that when she left the Severn at the time she and her husband separated she took the certificates of stock with her; that after their separation she continued to receive checks for the dividends on the stock as she had always, and that before they separated she would endorse them and give them to Mr. Colmary. When asked what he did with the money, she replied: "Well, he was always giving me money, you know, and I supposed naturally this was included in what I got; I never questioned it at all." She further testified that the plaintiff got the safe referred to after his father's death, and she thought about three or four years after; that he gave her a duplicate key and showed her how to use it, saying that if it was ever necessary for her to

go into the safe she would know how to use it, and that he never suggested putting the certificates in the safe. When asked to tell the Court what she heard Mr. Colmary say about the gift of the stock to her, she replied: "He never intimated or inferred in any possible way to me that these shares of stock were not an outright gift; I never had any reason to suppose that he had any underlying thought with them, except the one thought that I was aware of, which was that they were simply gifts to me." When asked what she had heard him say in the presence of friends about these shares of stock, she said he had frequently spoken of them, particularly when dividends were declared, and that she remembered quite well the incident referred to by her sister, which occurred in the dining room at the Severn. When asked to tell what occurred then she replied: A couple of Jesuit priests were dining with us, Father Jerome Dougherty, who is now in Philadelphia and in very poor health, Father Conway, who is at Georgetown University, and he took this dividend and threw it across the table to me, which these gentlemen resented at the time, thought it was anything but polite; he said, see what I have done for Sadie, I have put her on the shady side of easy street; not many husbands are so generous to their wives as I have been and am with mine." She states that the dividend referred to was a check from the Crown Cork and Seal Company for an extra dividend amounting to $600.00. Her attention was then called to the statement of the plaintiff when testifying to the effect that she had said to him that she understood that the stock was not hers, and that she did not feel that she had the right to dispose of it, and she was asked if she ever said anything like that to him, to which she replied: "No, I never said it." The Court then asked her: "Can you go back to the time when Mr. Colmary brought the first certificate of stock and undertake to tell us what at that time he said with regard to that certificate, in other words, when he brought the first five shares in 1892, do you remember what he then said to

you with regard to that certificate?" and she replied: "I think—of course now I can't recall absolutely—but my impression is, my recollection of it is that he was pleased at having succeeded in getting this stock; he had been wanting to get some stock for me because he had heard of course, through Mr. Cole, how valuable it was, and he had been wanting to get a present for me at this time, and he handed it to me and said, Here is a gift for you, Sadie, this is a present for you which I have succeeded in getting, and I only hope I will be able to get more of the same for you."

Upon this evidence the Court below decreed that the stock in question was the property of Mrs. Colmary, and from that decree the plaintiff has appealed.

We have set out the evidence at considerable length because the statement of it can, in our view, lead to but one conclusion, viz, that the decree of the learned Court below must be affirmed.

It must be conceded that if Mr. Colmary caused the certificates to be issued in the name of his wife and subsequently delivered them to her with the intention of giving her the stock, nothing more was required to complete an absolute and irrevocable gift. *Pennington* v. *Gittings,* 2 G. & J. 208; *Ballimore Retort & Brick Co.* v. *Mali,* 65 Md. 93; *Snowden* v. *Crown Cork & Seal Company,* 114 Md. 650. That he did have the certificates issued in her name, and that he did deliver them to her is also conceded, and the only question is for what purpose or with what intention was it done? He states that he had the stock issued in her name because he thought it would be just as safe in her name as in his, and that he took the certificates home and handed them to his wife and asked her to take care of them, as he had done with all papers. Therefore according to his testimony the stock was not issued or delivered to his wife with the view or intention of giving her the stock. On the other hand Mrs. Colmary states definitely and positively that he gave her the stock as he gave her her watch, etc., and told her that he in-

tended it as a gift to her. The presumption in such cases is clearly stated by JUDGE BURKE in the late case of *Dixon* v. *Dixon,* 123 Md. 44, where, after stating the general rule, he says: "The rule of law thus laid down is subject, however, to this qualification: 'If the person in whose name the conveyance of property is taken be one for whom the party paying the purchase money is under a natural or a moral obligation to provide, no equitable presumption of trust arises from the fact of the payment of the money, but, on the contrary, the transaction will be regarded, *prima facie,* as an advancement for the benefit of the nominee. In that case, therefore, it will be for the party who seeks to establish a trust in behalf of the prayer of the purchase money to displace, by sufficient evidence, the presumption that exists in favor of the legal title.' Accordingly, it is held that: 'If the parent should purchase in the name of his son, the purchase would be deemed, *prima facie,* as intended as an advancement so as to rebut the presumption of a resulting trust. But this presumption that it is an advancement may be rebutted by evidence manifesting a clear intention that the son shall take as trustee'; but it 'ought not to be frittered away by nice refinements.' 'A like presumption exists in the case of the purchase by a husband in the name of his wife. Indeed the presumption is stronger in the case of a wife than of a child; for she cannot at law be trustee of her husband.' " But in the case at bar this presumption, and the testimony of Mrs. Colmary, is so fully supported by the evidence of repeated statements of Mr. Colmary entirely at variance with his claim to the stock that there is no escape from the conclusion that he had the certificates issued in her name and delivered them to her for the purpose and with the intention of making an absolute gift of the stock to her.

The endorsement of the certificates by Mrs. Colmary is not explained in the testimony, and was not referred to in the bill. The appellant contends that the endorsement transferred the equitable title to the stock to Mr. Colmary under

section 38 of Article 23 of the Code of 1912, or the decision in *Noble* v. *Turner,* 69 Md. 524. Section 59 of that article, however, declares that sections 38 to 60 only apply to certificates issued after July 1, 1910. But whatever may have been the purpose of the endorsements, and regardless of any interest Mr. Colmary may have acquired thereby, he states that the certificates were endorsed at the time he received them from the company, and if he subsequently delivered them to Mrs. Colmary with the intention and for the purpose of consumating a gift of the stock to her, it is quite clear that the endorsements could not operate to defeat that intention, for whatever interest she had parted with having been thereby restored to her, the endorsements ceased to be operative, and could have been cancelled by her.

Counsel for the appellant insist that there was error in the refusal of the Court below to permit the plaintiff to state what his intention was in having the certificates issued in the name of his wife and delivering them to her. But if we assume this contention to be sound, it is perfectly apparent that the error was not a reversible error, for the whole purport of the plaintiff's testimony was that he did not intend to give her the stock, and he could not therefore have been prejudiced by the exclusion of the evidence referred to.

The case of *In re Bauernschmidt's Estate,* 97 Md. 35, cited and relied upon by the appellant, deals with the question of what constitutes a delivery. Here no such question is presented, for it is conceded that the certificates did pass into the possession of Mrs. Colmary, and the only question is for what purpose were they delivered to her?

*Decree affirmed, with costs.*