HENRY W. GIESE et al.

*vs.*

JOHANNA M. L. PAKENDORF et al.

*Resulting Trust—Statute of Frauds—Specific Performance.*

A resulting trust in certain land did not arise in favor of plaintiffs, without the payment by them of any money, merely because defendant, before purchasing such land, had agreed to sell to them specific parts of the land.                pp. 678, 679

An agreement by one, in case of his purchase of certain land, to sell specific parts thereof to the other parties to the agreement, is within the statute of frauds.                p. 679

Specific performance of an alleged agreement by defendant, in the event of his purchase of ceratin land, to sell parts thereof to plaintiffs, *held* improper, in view of the lack of evidence as to the existence and terms of such agreement.                p. 681

*Decided February 2nd, 1921.*

Appeal from the Circuit Court for Baltimore County, In Equity (PRESTON, J.).

The cause was argued before BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*John Watson, Jr.* with whom was *Thos. Foley Hisky* on the brief, for the appellants.

*R. E. Kanode* and *Harry C. Kalben,* for the appellees, submitted the cause on brief.

STOCKBRIDGE, J., delivered the opinion of the court.

The estate of Orville Horwitz owned a tract of land at Catonsville, Baltimore County, at the intersection of the Frederick Road and Ingleside Avenue. Upon this were erected

a number of stores and dwellings, known and designated as Nos. 700, 702, 704, 708, 710 and 712 Frederick Road.

These were leased to various tenants, who are the parties appellent and appellee in this case.

In the summer of 1919 it came to the knowledge of some of these tenants that this property of the Horwitz estate was for sale in its entirety, but that the trustees of that estate would not sell segregated portions to various people. Among others, this knowledge was given to the appellant, Henry W. Giese, who appears to have promptly communicated it to all of the tenants besides himself, and with the added suggestion upon his part that the tenants should form a combination for the purchase of the property, each contributing a ratable proportion of the purchase money.

While no very definite agreement appears to have been made, all the tenants seem to have acted upon the course so suggested for their own protection, and accordingly Mr. Giese and a Mr. Scop visited the agent of the Horwitz estate and closed a purchase of the property at a price of $22,500. The deed for the property was made to Giese alone.

The property thus acquired included the stores and dwellings Nos. 700 to 712, inclusive, on Frederick Avenue, and extended northward a little distance further than did any of the improvements on the Frederick Road front of the lot. The entire purchase money was paid by Mr. Giese, none of the other tenants at that time furnishing any part, although there seems to have been an understanding of some sort that each would pay a proper ratable proportion of the purchase money, but whether such proportion was to be ascertained by the number of front feet, the number of square feet, a capitalization of the rents they were then paying, or an arbitrary apportionment, does not clearly appear.

Then ensued several meetings of the parties interested, which were held apparently with the purpose of agreeing upon the prices to be paid by each, respectively, and the method of the division of the lots. A surveyor was employed

to give a description of the several lots in accordance with the improvements as they then stood, and there was some talk of laying off an alley in the rear of the several lots, which would leave an entirely unimproved lot of ground north of the alley and between Baldwin and Ingleside Avenues. The disposition of this lot does not appear to have been definitely determined. Some of those interested apparently favored the selling of it, and a division of the proceeds of such sale among the tenants of the Frederick Road front. But the evidence totally fails in showing that there was any definite agreement upon this point.

After having acquired the property from the trustees of the Horwitz estate, Mr. Giese did sell and convey, to all of those who had theretofore been tenants, the premises occupied by them, respectively, with the exception of Mrs. Johanna M. L. Packendorf and Kenley E. Garber. The first of these occupied the premises adjoining Mr. Giese, and the second occupied the premises at the corner of Frederick Road and Ingleside Avenue, the most valuable of all the lots.

The bill in this case was filed by Mr. Garber and Mrs. Packendorf against Giese and the other tenants, the object and purpose of the plaintiffs' bill being to compel the conveyance to them of the premises occupied by them, respectively, upon payment of the sum of $6,000 for the Garber lot and $2,750 for the Packendorf lot. The bill recites those amounts as having been agreed to be paid by the plaintiffs previously to the sale to Giese, and further expresses the readiness of the plaintiffs to carry out this alleged agreement.

A demurrer was filed to the bill, which was overruled, the ground of the demurrer being that the alleged agreement came within the operation of the Statute of Frauds, and for that reason was unenforceable. After the ruling upon the demurrer the defendants answered fully, and the case was heard upon the bill, answers and evidence, and it is from the decree then rendered that the present appeal was taken.

The position of the plaintiffs was, in effect, that in the purchase of the property from the Horwitz estate Mr. Giese was acting as agent for all the tenants, and that in that position he would not be permitted in equity to take advantage for his own profit of having had the property conveyed to himself alone, and that under the facts in the case his purchase in his own name, when he was in reality acting for all of the tenants, gave rise to a resulting trust in favor of these tenants, and that the Statute of Frauds had no application where there was a resulting trust.

It is perfectly true, and was so stated by this Court speaking through JUDGE BOYD, in the case of *Beachey* v. *Heiple,* 130 Md. 68, that Section 8 of the Statute of Frauds takes resulting trusts out of the operation of the statute, and that such trusts are not required to be in writing.

There are a large number of decisions in the several states upon questions closely analagous to those which are presented in this record, and these decisions, unfortunately, are not entirely harmonious, but we have no need in Maryland to look beyond our own decisions to determine the proper rule to be applied in such cases.

Starting with the case of *Dorsey* v. *Clark,* 4 H. & J. 551, and coming on down through *Green* v. *Drummond,* 31 Md. 71; *Cecil Bank* v. *Snively,* 23 Md. 253; *Dixon* v. *Dixon,* 123 Md. 44, and *Wiley* v. *Wiley,* 115 Md. 646, we find a line of decisions that has not been deviated from and which must be controlling in the present case.

In order that there may be a resulting trust there must have been a payment by the parties asking the enforcement of such trust, of the whole or a part of the purchase money. Then, and then only, can a resulting trust arise; or as some of the cases put it, the foundation for such a trust lies in the payment of the consideration by the parties asking the enforcement of an equitable right as against the agent. It is sometimes said that the authority of the agent need not be in writing: *Rose* v. *Hayden,* 35 Kan. 106; also that a re-

sulting trust must arise at the time of the payment, it cannot arise from a subsequent payment, *Brayner* v. *Shaup,* 21 Md. 328.

In *Witts* v. *Horney,* 59 Md. 585, JUDGE MILLER lays down the rule that, "Where one party purchases an estate and pays the money, and the deed is taken in the name of another, a trust results by construction of law to the party who paid the money, and such payment may be proved by parol, but in all such cases the proof of the payment must be clear, direct and explicit."

It is impossible in a case like the present, where there is no pretense that either of the plaintiffs ever paid one cent towards the purchase money, that they can claim a benefit in the way of a resulting trust, and, therefore, the case cannot fall within the exceptions contained in Section 8 of the Statute of Frauds, and since it is an agreement with regard to lands, it follows that the transaction would be amenable to the provisions of Section 4.

The most favorable view which can be taken of the plaintiff's bill, is that it is a bill for specific performance of an agreement. To entitle the plaintiffs to relief of this nature it must clearly appear just what the agreement was, which they are asking to have enforced. Since relief of this nature is never granted *ex debito justiciae,* but is one to appeal to the sound discretion of an equity court, it is exceedingly important that, before any such relief is granted, there shall appear to have been an entire concurrence of the parties upon the terms of the agreement sought to be enforced.

A careful examination of the evidence fails to disclose any such clear-cut agreement, prior to the actual purchase by Giese. In fact it can hardly be said with any certainty that he did interview all of the tenants, for in answer to the question put to Mr. Garber, "Did he say anything at that time with reference to seeing the other tenants?" he said: "He thought they all would take the property; I don't know that he had seen all, but he said he thought they all would."

After the property had been purchased, as previously noted, there were interviews or meetings between Mr. Giese and the other tenants, and Mr. Garber was asked: "Was that agreed to at that meeting, that you would accept that price (between $5,800 and $6,000); you all would agree to it? A. No. Q. It was not settled? A. No. Q. Anything done at that meeting as to any definite part in reference to the amount each one of the tenants should contribute toward the purchase price? A. No."

And a little later Mr. Garber was asked: "Did you offer to pay him your proportionate part? A. Yes, I asked him what my proportionate part was and I would pay it * * * He said, not necessary, and I didn't do it."

Mr. Garber later on, in answer to a question, testified that Mr. Giese had told him that all the tenants had agreed to take the property, that he believed they all had, they all had agreed to take it. Mr. Garber also upon cross-examination said, there was a meeting at which the price for his lot was mentioned at $6,000, and that at that same meeting the sums of $10,000 and $8,000 were also mentioned, and that Mr. Giese said he would take the Garber lot himself at $6,000. The same witness was asked whether there was ever any meeting at which it was agreed to let the witness have the property, his lot of ground at any fixed price, to which he replied, "No, not to me"

Another of the tenants, a Mr. Baldwin, was asked for whom Mr. Giese bought the property; to which he replied, "The supposition was he bought it for all the tenants," and his cross-examination included the following question and answer: "Q. I want to ask you whether or not up to the time of this agreement being entered into by you at any meeting of these parties, there was ever any definite agreement arrived at as to exactly the cost of the lots or the width of the alley or what was to be done with the remaining lot, or what we call the back lot; had there up to that time ever been any definite agreement arrived at amongst these parties? A. No."

Mr. Morris Scop, who accompanied Mr. Giese to the real estate agent when he bought the property, was asked: "At the time you went down to Mr. Yearley's office you went down for the purpose of buying the property for whom? A. For the tenants if they wanted it, and if they didn't want it we should keep it, me and Mr. Giese. Q. You yourself had never been to see the other tenants to find out if they agreed to take the other property? A. No, sir."

The plaintiff, Mrs. Packendorf, seems to have attended very few of the meetings of the tenants, but the evidence already quoted was given by certain of the tenants, who were placed on the stand by the plaintiffs, and there is no contradiction anywhere of the evidence given by them, to which reference has been made.

This falls very far short of showing such a case of agreement that a court of equity ought to attempt to decree a specific performance, even if there was no question of the applicability of the Statute of Frauds in the case. In the case as presented by the bill and answers, and brought out in the evidence, this Court has no option but to reverse the decree appealed from, and dismiss the bill.

*Decree reversed, with costs, and bill dismissed.*